503 F.2d 1305
 Ricky WYATT, By and Through his aunt and legal guardian Mrs.
W. C. Rawlins, Jr., et al., etc., Plaintiffs-Appellees,
v.
Charles ADERHOLT, as Commissioner of Mental Health, et al.,
Defendants, The Alabama Mental Health Board, an Agency of
the State of Alabama, and George C. Wallace, as Governor of
Ala., Defendants-Appellants.
 No. 72-2634.
 United States Court of Appeals, Fifth Circuit.
 Nov. 8, 1974.
 
 Charles M. Crook, Montgomery, Ala., for Gov. Wallace.
 William Baxley, Atty. Gen., George Beck, Deputy Atty. Gen., Montgomery, Ala., for Ala. Mental Health Board.
 George W. Dean, Jr., Destin, Fla., Shelly Mercer, Nat'l. Health & Environmental Program, School of Law, UCLA, Los Angeles, Cal., Jack Drake, Tuscaloosa, Ala., Morton Birnbaum, Brooklyn, N.Y., for plaintiffs-appellees.
 Paul Friedman, Patricia M. Wald, Mental Health Law Project, Washington, D.C., for Nat. Council on the Rights of the Mentally Impaired.
 Bruce Ennis, New York City, for NCRMI & Am. Psy. Assoc., and others.
 Stanley Herr, NLADA, Nat. Law Office, James F. Fitzpatrick, Jeffrey Bauman, Washington, D.C., Ira DeMent, U.S. Atty., Kenneth E. Vines, Asst. U.S. Atty., Montgomery, Ala., Edward Lynch, President's Committee on Mental Retardation, Washington, D.C., for United States.
 Robert H. Johnson, Atty., Civil Rights Div., U.S. Dept. of Justice, Louis M. Thrasher, Associate Director, Washington, D.C., for United States, amicus curiae.
 Charles R. Halpern, Center for Law & Social Policy, Washington, D.C., for Mental Health Law Project, amicus curiae.
 Warren E. Magee, Washington, D.C., for Amer. Psychiatric Association, amicus curiae.
 Sheridan Neimark, Washington, D.C., for NSAC, amicus curiae.
 Before WISDOM, BELL and COLEMAN, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 In this case, we must decide whether federal district courts have the power to order state mental institutions to provide minimum levels of psychiatric care and treatment[1] to persons civilly committed to the institutions.
 
 
 2
 The guardians of patients civilly committed to three Alabama facilities for the mentally handicapped brought this class action on behalf of their wards and other civilly committed patients at those institutions. The Honorable Frank M. Johnson, trial judge, held that mentally ill patients 'have a constitutional right to receive such individual treatment as will give each of them a reasonable opportunity to be cured or to improve his or her mental condition'. Wyatt v. Stickney, M.D.Ala.1971, 325 F.Supp. 781, 784. In a later order, Judge Johnson held that the mentally retarded patients have a constitutional right to 'such individual habilitation as will give each of them a realistic opportunity to lead a more useful and meaningful life and to return to society'. Wyatt v. Stickney, M.D.Ala.1972, 344 F.Supp. 387, 390. The district court found that conditions at the three facilities deprived the plaintiffs of these constitutional rights, and ordered the defendants-appellants, Alabama officials responsible for the administration of the state's mental health programs, to implement a detailed set of standards designed to ensure the provision of minimally adequate treatment and habilitation at the institutions. From this order, the Alabama Mental Health Board and Alabama's Governor George C. Wallace bring separate appeals.
 
 
 3
 Together, the Mental Health Board and the Governor advance six major contentions on appeal. They contend (1) that the district court erred in holding that civilly committed mental patients have a constitutional right to treatment; (2) that the court lacked jurisdiction because the suit was in effect a suit against the state proscribed by the eleventh amendment; (3) that the case involves rights and duties not susceptible to determination by judicially ascertainable and manageable standards, and therefore presents a non-justiciable controversy; (4) that the order of the district court invades a province of decision-making exclusively reserved to the state legislature; (5) that the plaintiffs were not entitled to equitable relief because they had adequate remedies at law to protect the rights they asserted; and (6) that the district court erred in awarding plaintiffs a reasonable attorneys' fee.
 
 
 4
 Neither in the district court nor on appeal to this Court have the defendants challenged the detailed set of standards articulated by the district court. They have conceded that if there is a constitutional right to treatment enforceable by a suit for injunctive relief in federal court, those standards accurately reflect what would be required to ensure the provision of adequate treatment.
 
 I.
 A. The proceedings below
 
 5
 This case began innocuously enough, when a cut in the Alabama cigarette tax forced the state to fire 99 professional, subprofessional, and intern employees[2] at the Bryce Hospital, a state-run institution for the mentally ill at Tuscaloosa. The plaintiffs filed their complaint October 23, 1970. The complaint named two classes as plaintiffs. One, represented by Ricky Wyatt and two other named plaintiffs, appellees here, consisted of the patients at Bryce. The other, represented by five of the then recently terminated employees, consisted of the employees who had been dismissed for budgetary reasons. The defendants were Stonewall B. Stickney, then Executive Officer of the Alabama State Mental Health Board; Dr. John V. Hottel, his Chief Deputy; the members of the Board; then Governor Albert P. Brewer, both in his capacity as Governor and in his capacity as a member of the Board; and Judge Perry O. Hooper, Probate Judge of Montgomery County, both individually and as a representative of the class consisting of all probate judges in Alabama.
 
 
 6
 The complaint alleged that the defendants had effected the staff reductions purely for budgetary reasons; that the discharges of the 99 employees had been accomplished without notice and a hearing, and violated the employees' rights under the due process clause; and that as a result of the discharges the patients at Bryce would not receive adequate treatment. The complaint sought injunctive relief requiring the defendants to insure that treatment programs then being administered at Bryce would not be interrupted or altered, and requiring the defendants to rescind the terminations of the 99 employees.
 
 
 7
 The original complaint did not allege that treatment levels at Bryce had been inadequate before the terminations. For reasons not entirely clear from the record before us, however, the focus of the litigation soon shifted from the effects of the October 1970 terminations to questions of the overall adequacy of the treatment afforded at the Alabama state mental hospitals. On January 4, 1971, the plaintiffs amended the complaint to add prayers that the defendants be enjoined from operating Bryce 'in a manner that does not conform to constitutional standards of delivering adequate mental treatment to its patients'; that the Court order defendants to prepare a 'comprehensive constitutionally acceptable plan to provide adequate treatment in any state mental health facility'; and that the court declare that patients confined to a state mental helath facility are entitled to 'adequate, competent treatment'.
 
 
 8
 On March 12, 1971, the district court ruled on the plaintiffs' motion for a preliminary injunction. 325 F.Supp. 781. The court's opinion reflected the shift in the focus of the case. In its opinion, the court declared that patients 'involuntarily committed through noncriminal procedures and without the constitutional protections that are afforded defendants in criminal proceedings' are 'committed for treatment purposes' and so 'unquestionably have a constitutional right to receive such individual treatment as will give each of them a relaistic opportunity to be cured or to improve his or her mental condition'. 325 F.Supp. at 784. The court found that the treatment programs in effect before the institution of a staff reorganization then in progress were 'scientifically and medically inadequate', failing to 'conform to any known minimums established for providing treatment for the mentally ill'. Id. The court stated that it was not at that time in a position to determine whether the treatment which would be provided after the reorganization was completed would be adequate. Accordingly, the court allowed the defendants ninety days to report progress made in the reorganization plan, and to file with the Court a 'specific plan' for the provision of adequate treatment at Bryce. Also in the March 12 order, the court invited the United States, through the Department of Justice and Health, Education and Welfare, to appear as amicus.
 
 
 9
 On August 4, 1971, the plaintiffs amended their complaint to allege that the Search Hospital at Mount Vernon, Alabama, the one other state hospital for the mentally ill in Alabama, and the Partlow State School and Hospital, Alabama's state facility for the mentally retarded, were being operated in a constitutionally impermissible manner.
 
 
 10
 On September 13, 1971, six months after the March 12 order, the defendants filed their report on proposed standards of adequate treatment and their implementation. Objections to the report were later filed by the plaintiffs and by the United States, as well as by several interested private organizations which had been granted leave to appear as amici.[3]
 
 
 11
 The court announced its conclusions upon review of the report and the objections to it in an opinion issued December 10, 1971. 334 F.Supp. 1341. In this opinion, the district court held that there are three 'fundamental conditions for adequate and effective treatment': a 'humane physical and psychological environment'; qualified staff 'in numbers sufficient to administer adequate treatment'; and individualized treatment plans. The court held that the reports before it showed 'rather conclusively' that the treatment programs at Bryce did not meet any of these conditions. It also noted that conditions at Searcy and Partlow seemed little better. It concluded that the defendants had failed to 'formulate minimum medical and constitutional standards for the operation of these institutions'. The court scheduled a formal hearing to take evidence necessary to establish standards, and said that after the hearing it, the court, would itself 'establish standards and in due course order their implementation'.
 
 
 12
 The court postponed the hearings to give the defendants another opportunity to formulate proposed minimum standards. On January 17, 1972, the parties and amici met in Atlanta, Georgia, where they undertook extensive discussions concerning the proper standards of treatment at the Alabama hospitals. Out of these discussions came two Memoranda of Agreement stipulating certain of the standards necessary to define what would constitute minimally adequate mental treatment at a state psychiatric institution. One of the Memoranda covered standards for treatment at the mental hospitals, Searcy and Bryce; the other covered standards to be imposed at the school for the mentally retarded, Partlow. These Memoranda were filed with the district court at the times for the hearings set for determining the proper standards. The hearing concerning Bryce and Searcy was held February 3 and 4, 1972; the hearing concerning Partlow was held February 28-March 2.[4]
 
 
 13
 The district court announced its orders granting permanent injunctive relief in two opinions issued April 13, 1972. One of the opinions concerned Partlow, the other, Bryce and Searcy. 344 F.Supp. 373 (Bryce-Searcy), 390 (Partlow). In Partlow, Judge Johnson held that 'because the only constitutional justification for civilly committing a mental retardate . . . is habilitation, it follows ineluctably' that civilly committed retardates 'have a constitutional right to receive such individual habilitation as will give each of them a realistic opportunity to lead a more useful and meaningful life and to return to society'. The Bryce-Searcy opinion summarized the court's earlier opinions, noting its holding that the civilly mentally ill have a constitutional right to treatment. Beyond this, the two opinions were substantially identical. Both ordered the defendants (1) to implement an elaborate set of standards of treatment set forth in appendices to the opinions; (2) to establish human rights committees at the institutions to review all research and treatment programs 'to ensure that the dignity and human rights of the residents are preserved'; (3) to prepare and file reports within six months of the orders on the implementation of the standards; and (4) to pay court costs and a reasonable attorneys' fee to the plaintiffs. The Partlow order also required the defendants to hire a qualified administrator for the School within sixty days.[5]
 
 
 14
 Governor Wallace and the Mental Health Board filed separate notices of appeal May 12, 1972. On May 22, Governor Wallace filed a motion for modification and for a stay pending appeal. On June 1, the district court issued an opinion fixing the amount due plaintiffs as attorneys' fees at $36,744.62. 344 F.Supp. at 408-411. On June 26, the district court denied the motions for modification and for a stay pending appeal. This Court also denied a motion for a stay pending appeal.
 
 B. The conditions in the Alabama hospitals
 
 15
 There has not been any significant dispute, in this Court or in the district court, about the conditions that prevailed in the Alabama hospitals at the time this suit was instituted. The defendants have pitched their defense on their argument that the Constitution does not guarantee a right to treatment; they have virtually conceded that if such a constitutional right exists, the conditions in the hospitals were such that the state's constitutional obligation to provide adequate treatment could not be met. There is therefore little reason for an extended discussion of the conditions that prevailed at the hospitals. Some discussion, however, is essential to understanding this case. We therefore note briefly how far short the hospitals fell of meeting the three 'fundamental conditions of adequate and effective treatment' defined by the district court.
 
 
 16
 First, it is clear that the environment at the hospitals was a far cry from the 'humane psychological and physical environment' the district court envisioned as sine qua non of rehabilitative treatment. Bryce Hospital was built in the 1850's; it had 5000 inmates of whom 1500 to 1600 were geriatrics, 1000 were mental retardates, and there were allegedly other non-mentally ill persons. Patients in the hospitals were afforded virtually no privacy: the wards were overcrowded; there was no furniture where patients could keep clothing; there were no partitions between commodes in the bathrooms. There were severe health and safety problems: patients with open wounds and inadequately treated skin diseases were in imminent danger of infection because of the unsanitary conditions existing in the wards, such as permitting urine and feces to remain on the floor; there was evidence of insect infestation in the kitchen and dining areas. Malnutrition was a problem: the United States described the food as 'com(ing) closer to 'punishment' by starvation' than nutrition. At Bryce, the food distribution and preparation systems were unsanitary, and less than 50 cents per day per patient was spent on food. Dr. Donald L. Clopper, Associate Commissioner for Mental Retardation for the Alabama Department of Mental Health, testified that Partlow was a 'stepchild' in the State of Alabama; that the physical environment was inadequate for treating inmates; that 'we don't have the staff we don't have the facilities, nor do we have the financial resources'. According to Dr. Clopper, at least 300 Partlow inmates could be discharged immediately, and about 70 percent of the inmates should never have been committed; yet it was 60 percent over-crowded. Patients at Partlow were forced to perform uncompensated labor. Aides frequently put patients in seclusion or under physical restraints, including straitjackets, without physicians' orders. One resident had been regularly confined in a straitjacket for more than nine years. The Evaluation Report on Partlow by the American Association on Mental Deficiency stated that nine working residents would feed 54 young boys ground food from one very large bowl with nine plates and nine spoons; 'since there were no accommodations to even sit down to eat,' it was impossible to tell which residents had been fed and which had not been fed with this system. Seclusion rooms were large enough for one bed and a coffee can, which served as a toilet. The patients suffered brutality, both at the hands of the aides and at the hands of their fellow patients; testimony established that four Partlow residents died due to understaffing, lack of supervision, and brutality.[6]
 
 
 17
 The hospitals failed to meet the second condition, adequate staffing. The defendants' chief witness on standards maintained that treatment could be delivered with the ratio of one psychiatrist, one graduate level psychologist, and one masters level social worker for every 125 patients, and the district court ultimately adopted this recommendation. The organizations appearing as amici had recommended higher ratios-- one psychiatrist, one psychologist, and one social worker for every 30-50 patients. But at the time this suit was instituted there were ratios of only one medical doctor with some psychiatric training for 5,000 patients, one Ph.D. psychologist for every 1,670 patients, and one masters level social worker for every 2,500 patients at Bryce. The parties and amici agreed completely on the minimums necessary for treatment of the mentally retarded. They agreed that adequate treatment could be delivered at Partlow with ratios of one masters level psychologist and one masters level social worker for every sixty patients, and one physician for every two hundred patients. Yet at Partlow there were only one psychologist with masters level training or above for every 1,200 patients; one masters level social worker for every 730 patients; and one physician for every 550 patients. Of the four physicians at Partlow, two were not licensed to practice in Alabama.
 
 
 18
 A severe shortage of nonprofessional staff paralleled the inadequacies of professional staff. After a tour of Bryce, defendants' own consultants noted that:
 
 
 19
 Aide staff is spread very thin, creating extreme stresses for individual aides, who at times must cover one or two or three wards, housing as many as 100 or 200 patients. Obviously, it is impossible under such circumstances to provide anything more than a cursory observation and the hope of avoiding disturbing incidents. An aide under these circumstances is hard pressed to meet even minimum patient needs.
 
 
 20
 The institutional staff was inadequate not only in sheer numbers but also in training; there was no effective 'inservice training' program for, or even any regular supervision over, the nonprofessionals.
 
 
 21
 Finally, the evidence established that the hospitals failed to meet the third condition, individualized treatment programs. According to one consultant's testimony, care of patients at Partlow was not suited to the needs of particular individuals, but was instead 'geared primarily to housekeeping functions-- cleaning floors, cleaning beds, cleaning patients-- and to a continuation of work assignments'. Experts testified that the patient records kept at the hospital were wholly inadequate; that they were written in such a way as to be incomprehensible to the aide level staff that had prime responsibility for patient care; and that they were kept where they were not accessible to the direct care staff particularly in need of them.
 
 II.
 
 22
 The appellants' first and principal contention on appeal is that the Constitution does not guarantee persons civilly committed to state mental institutions a right to treatment.[7] This contention is largely foreclosed by our decision, issued since the institution of this appeal, in Donaldson v. O'Connor, 1974, 493 F.2d 507. In Donaldson, we held that civilly committed mental patients have a constitutional right to such individual treatment as will help each of them to be cured or to improve his or her mental condition. We reasoned that the only permissible justifications for civil commitment, and for the massive abridgments of constitutionally protected liberties it entails, were the danger posed by the individual committed to himself or to others, or the individual's need for treatment and care. We held that where the justification for commitment was treatment, it offended the fundamentals of due process if treatment were not in fact provided; and we held that where the justification was the danger to self or to others, then treatment had to be provided as the quid pro quo society had to pay as the price of the extra safety it derived from the denial of individuals' liaberty.
 
 
 23
 Our discussion in Donaldson, briefly summarized here, answers most of the arguments made by the appellants on this appeal against the recognition of a constitutional right to treatment. Governor Wallace, however, makes one argument not answered by our discussion in Donaldson, and it is appropriate that we address that argument here. Governor Wallace challenged the assumption, made by the district court in this case and by this Court in Donaldson, that the only permissible justifications for confinement are danger to self or others or need for treatment. Instead, the Governor suggests, the principal justification for commitment lies in the inability of the mentally ill and mentally retarded to care for themselves. The essence of this argument is that the primary function of civil commitment is to relieve the burden imposed upon the families and friends of the mentally disabled. The families and friends of the disabled, the Governor asserts, are the 'true clients' of the institutionalization system.[8]
 
 
 24
 From this premise the Governor proceeds to the conclusion that is the crux of his argument. If 'need for care' is a justification for commitment-- or is the justification-- then it follows that the mere provision of custodial care is constitutionally adequate to justify continued confinement. 'The providing of custodial care alone is a tremendously important consideration to patients, their families, and the public-at-large', the Governor writes in his brief.
 
 
 25
 There are two answers to this line of argument. The first, and more limited, is that even accepting the Governor's premise that 'need for care' is a constitutionally adequate justification for confinement, it does not follow that we must accept the conclusion-- that the kind of care that was provided at the Alabama hospitals is sufficient to make continued confinement constitutional. The assertion that 'need for care' justifies confinement implies that the state has an affirmative obligation to provide a certain minimum quality 'care', no less than the assertion that 'need for treatment' justifies confinement implies that the state has an affirmative obligation to provide a certain minimum quality 'treatment'. And it is clear that, however that obligation might specifically be defined, it was not being met in the Alabama hospitals. Dr. Gunnar Dybwad, Professor of Human Development at the Graduate School for Advanced Studies in Social Welfare at Brandeis University, and a one time presidential consultant in the field of mental retardation, made essentially this point when he testified about conditions at Alabama's Partlow State School and Hospital:
 
 
 26
 The situation which exists and obviously has existed in Partlow for a long time is one of storage, of persons. I am using that word because I would not use care, which involves-- has a certain qualitative character, and I would not even use the word, 'custodial,' because custody, in my term, means safekeeping. And, as is visible to the visitor at the present time, employees at Partlow are not in a position to effect safekeeping, considering the number of people they have to take care of; so I would say it is a storage problem at the moment.
 
 
 27
 Indeed, many of the standards established by the district court in this case-- notably those required for what the district court called a 'humane psychological and physical environment'-- might have to be met for the state to be able legitimately to claim it was providing adequate 'care' to its mental patients. At least where the right to a 'humane environment' is concerned, then if it is irrelevant whether the right be viewed as a facet of a 'right to treatment', or of a 'right to care'. It is likewise irrelevant for those purposes whether the state interest imputed to the civil commitment system be called the need 'to treat' the mentally ill, or the need 'to care' for them.
 
 
 28
 But beyond this, we find it impossible to accept the Governor's underlying premise that the 'need to care' for the mentally ill-- and to relieve their families, friends, or guardians of the burdens of doing so-- can supply a constitutional justification for civil commitment. At stake in the civil commitment context, as we emphasized in Donaldson, see 493 F.2d at 520, are 'massive curtailments' of individual liberty. Against the sweeping personal interests involved, Governor Wallace would have us weigh the state's interest, and the interests of the friends and families of the mentally handicapped in having private parties relieved of the 'burden' of caring for the mentally ill. The state interest thus asserted may be, strictly speaking, a 'rational' state interest. But we find it so trivial beside the major personal interests against which it is to be weighed that we cannot possibly accept it as a justification for the deprivations of liberty involved.
 
 
 29
 The other arguments against recognition of a constitutional right to treatment for civilly committed mental patients advanced by the appellants are, as we noted above, answered by our discussion in Donaldson. Following Donaldson, we hold that the district court here did not err in finding that civilly committed mental patients have a constitutional right to treatment. Our express holding in Donaldson and here rests on the quid pro quo concept of 'rehabilitative treatment, or, where rehabilitation is impossible, minimally adequate habilitation and care, beyond the subsistence level custodial care that would be provided in a penitentiary.' 493 F.2d at 522.
 
 III.
 
 30
 The second, third, fourth, and fifth issues raised by the appellants are also substantially affected by our decision in Donaldson, and present little difficulty except as to some aspects of remedy which will be discussed in Part IV, infra. The argument that this suit is barred by the eleventh amendment is based largely upon Burnham v. Department of Public Health, N.D.Ga. 1972, 349 F.Supp. 1335, appeal docketed, No. 72-3110, 5 Cir., Oct. 4, 1972, a case consolidated for argument on appeal with this case. In Burnham, the court held that, because the right to treatment was a right arising only, if at all, under state law, a suit by citizens of the state against state officials to enforce the right was barred by the eleventh amendment. Our holding in Donaldson, however, vitiates this argument, of course, for we have now established that the right to treatment arises as a matter of federal constitutional law under the due process clause of the Fourteenth Amendment.
 
 
 31
 In Donaldson, we addressed and rejected the argument that a constitutional right to adequate treatment would present questions not susceptible to 'judicially manageable or ascertainable standards'. We held that the judiciary was competent to determine, at least in individual cases, whether psychiatric treatment was medically or constitutionally adequate. And we said in dictum that even in cases such as this one, 'when courts are asked to undertake the more difficult task of fashioning institution-wide standards of adequacy', 493 F.2d at 526, the courts would be able to formulate workable standards. In Donaldson, we took note of the substantial agreement reached in this case among parties and amici in developing standards during the course of the proceedings in the lower court. We cited that development as evidence supporting our view that workable standards could be fashioned. We remain mindful of that development here, in reaffirming our belief that the right to treatment can be implemented through judicially manageable standards.
 
 
 32
 The appellants' fourth contention is that the order of the district court invades a province of decision-making exclusively reserved for the state legislature. Governor Wallace argues that the order will require heavy expenditures of state funds; that these funds will have to come from other state programs; and that the duty of compromising and allocating funds among the many programs competing for them is a duty which must be discharged by the state governor and legislature alone. Governor Wallace concedes in his brief that he is not contending that 'the financial cost of complying with an established constitutional right is a valid reason for failure to comply'. He 'suggest(s) that before the Court decides to adopt a new constitutional right it should consider all of the consequences of its action, financial and social, and its effect on our federal form of government'. The Mental Health Board makes the point in a related way, by suggesting that the district court's order here is in effect an order requiring the state to furnish a particular service, and by citing cases establishing the general proposition that ordinarily it is not for the federal courts to say whether or in what amounts a state shall provide any particular government benefit or service. E.g., Fullington v. Shea, D.Colo.1970, 320 F.Supp. 500, aff'd, 404 U.S. 963, 92 S.Ct. 345, 30 L.Ed.2d 282.
 
 
 33
 We find these arguments unpersuasive. It goes without saying that state legislatures are ordinarily free to choose among various social services competing for legislative attention and state funds. But that does not mean that a state legislature is free, for budgetary or any other reasons, to provide a social service in a manner which will result in the denial of individuals' constitutional rights. And it is the essence of our holding, here and in Donaldson, that the provision of treatment to those the state has involuntarily confined in mental hospitals is necessary to make the state's actions in confining and continuing to confine those individuals constitutional. That being the case, the state may not fail to provide treatment for budgetary reasons alone. 'Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations'. Jackson v. Bishop, 8 Cir. 1968, 404 F.2d 571, 580 (Blackmun, J.), quoted, Rozecki v. Gaughan, 1 Cir. 1972, 459 F.2d 6, 8. 'Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights'. Hamilton v. Love, E.D.Ark.1972, 328 F.Supp. 1182, 1194. 'The obligation of the Respondents (prison officials) to eliminate unconstitutionalities does not depend upon what the Legislatures may do'. Holt v. Sarver, E.D.Ark.1970, 309 F.Supp. 362, 385, aff'd, 8 Cir. 1971, 442 F.2d 304. See also Hawkins v. Town of Shaw, 5 Cir. 1971, 437 F.2d 1286, 1292.
 
 
 34
 This conclusion is not novel. In the context of state penal institutions, the federal courts have repeatedly intervened to assure that the conditions of confinement do not invade the constitutional rights of those confined. E.g., Cruz v. Beto, 1972, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263; Johnson v. Avery, 1968, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718; Campbell v. Beto, 5 Cir. 1972, 460 F.2d 765; Landman v. Royster, E.D.Va.1971, 333 F.Supp. 621; Holt v. Sarver, E.D.Ark.1970, 309 F.Supp. 362, aff'd, 8 Cir. 1971, 442 F.2d 304. This Court has recognized that 'our constitutional duties require that the courts be ever vigilant to assure that the conditions of incarceration do not overstep the bounds of federal constitutional limitations'. Campbell, 460 F.2d at 767-768. In discharging these duties, the federal courts have in some cases entered decrees requiring substantial restructuring of state prison systems, but the courts have not hesitated to enter such decrees when necessary to safeguard the constitutional rights of prisoners. As the court said in Holt v. Sarver:
 
 
 35
 Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.
 
 
 36
 309 F.Supp. at 385.
 
 
 37
 Similar developments have occurred in the field of institutions for the detention of juveniles. Nelson v. Heyne, 7 Cir. 1974, 491 F.2d 352, aff'g, N.D.Ind.1972, 355 F.Supp. 451; Martarella v. Kelley, S.D.N.Y.1972, 359 F.Supp. 479, enforcing, 349 F.Supp. 575; Inmates of Boys' Training School v. Affleck, D.R.I.1972, 346 F.Supp. 1354; Morales v. Turman, E.D.Tex.1973, 364 F.Supp. 166.
 
 
 38
 The appellants' fifth contention, that the plaintiffs had adequate remedies at law, is also unpersuasive. In the Burnham case, the court held that the legal remedies of 'habeas corpus, medical malpractice, and ordinary tort actions' would supply adequate remedies to mental patients who claimed to have been denied a right to treatment. 349 F.Supp. at 1343. It found the plaintiffs' arguments to the contrary 'inconsistent with plaintiffs argument that each individual patient should have his particular therapy or treatment personalized'. Id. Governor Wallace and the Mental Health Board urge here the argument that damage and habeas corpus actions provide adequate legal remedies to the plaintiffs. The also point to the plaintiffs' argument that treatment must be individualized, and to the tension between that argument and the plaintiffs' insistence that injunctive relief on behalf of the plaintiff class is appropriate in this case.
 
 
 39
 We are unable to agree that injunctive relief is inappropriate merely because damages or habeas corpus relief may be available to some or all individual plaintiffs. While habeas corpus and tort remedies should play a valuable, indeed essential, role in enforcing the constitutional rights we recognized in Donaldson, those remedies are not capable of ensuring what the plaintiffs seek to ensure in this case. In the first place, habeas corpus relief and tort damages are available only after the fact of a failure to provide individual treatment. Here the plaintiffs seek preventive relief, to assure in advance that mental patients will at least have the chance to receive adequate treatment by proscribing the maintenance of conditions that foredoom all mental patients inevitably to inadequate mental treatment. Moreover, there are special reasons why reliance upon individual suits by mental patients would be especially inappropriate. Mental patients are particularly unlikely to be aware of their legal rights. They are likely to have especially limited access to legal assistance. Individual suits may be protracted and expensive, and individual mental patients may therefore be deterred from bringing them. And individual suits may produce distortive therapeutic effects within an institution, since a staff may tend to give especially good-- or especially harsh-- treatment to patients the staff expects or knows to be litigious.[9]
 
 
 40
 We see no inconsistency between this conclusion and the position taken by the plaintiffs, and by the district court, that treatment must be individualized. The plaintiffs here do not seek to guarantee that all patients will receive all the treatment they need or that may be appropriate to them. They seek only to ensure that conditions in the state institutions will be such that the patients confined there will have a chance to receive adequate treatment. This requires only the establishment of a program, institution-wide in scope, for developing and formulating individual treatment plans; it of course does not require the formulation, in this suit, of each individual plan. The question of what is necessary to the establishment of such a program is better resolved in a class action brought on behalf of all patients than it would be in a series of individual suits.
 
 IV.
 
 41
 We pretermit decision as to the remedy decreed by the district court to the extent herein stated. As we have held, the legislative power may not be used to deprive appellees of their constitutional right to treatment, but a substantial question is presented as to the scope of judicial power in implementing this right. The ultimate question will be, if all else fails, the method of effecting the financial outlay which will be necessary for the judiciary to give meaning to judicially precribed minimum constitutional standards for adequate treatment of the mentally ill.
 
 
 42
 Prior to the entry of the court's orders on April 13, 1972, 344 F.Supp. 373; 344 F.Supp. 387, the parties and amici stipulated to a number of specific conditions they agreed were necessary for a constitutionally acceptable minimum treatment program.[10] Because of these stipulations, we need not and do not reach decision as to whether the standards prescribed by the district court are constitutionally minimum requirements, or whether it is within the province of a federal district court, three-judge or single judge, to prescribe standards as distinguished from enjoining the operation of such institutions while constitutional rights are being violated.
 
 
 43
 Governor Wallace contends such stipulations are not binding on him or the Alabama legislature. As a party to the stipulations, through counsel, we hold the Governor has for his part agreed that these standards are minimally acceptable under the Constitution. The Alabama legislature presents a different problem. Clearly the Governor is without authority to agree to the expenditure of funds required to implement such a broad spectrum of standards when such a decision under Alabama law is reserved to the legislature. That the legislature was not a party to the stipulations in question or to this law suit reenforces this manifest principle of governmental organization. It is the Governor's role to propose relief to the legislature and, having stipulated the standards, to use his best efforts to accomplish the relief.
 
 
 44
 With respect to judicial accomplishment of the remedy, profound questions are presented regarding the scope of substantive due process and the role of federal courts in matters affecting the management of state institutions. Here we are concerned with the operation of state mental institutions within the parameters of substantive due process.[11]
 
 
 45
 The governor argues that the prescribed remedy will entail the expenditure annually of a sum equal to sixty per cent of the state budget excluding school financing, and a capital improvements outlay of $75,000,000. This is contested by appellees. However that may be, we regard as premature any issue as to whether the district court should appoint a Special Master for the purposes of selling or encumbering state lands to finance these standards, or should enjoin certain state officials from authorizing expenditures for nonessential state functions, and thereby alter the state budget, or by other means order a particular mode of financing the implementation of the stipulated standards.
 
 
 46
 Such remedial propositions are by the terms of the district court's April 13, 1972 not present orders; they lie in the uncertain future. The district court wrote:
 
 
 47
 '. . . this Court has decided to reserve ruling also upon plaintiffs' motion that defendant Mental Health Board be directed to sell or encumber portions of its land holdings in order to raise funds. Similarly, this Court will reserve ruling on plaintiffs' motion seeking an injunction against the treasurer and the comptroller of the State authorizing expenditures for nonessential State functions, and on other aspects of plaintiffs' requested relief designed to ameliorate the financial problems incident to the implementation of this order . . .. The responsibility for appropriate funding ultimately must fall, of course, upon the State Legislature and, to a lesser degree, upon the defendant Mental Health Board of Alabama. For the present time, the Court will defer to those bodies in hopes that they will proceed with the realization and understanding that what is involved in this case is not representative of ordinary governmental functions such as paving roads and maintaining buildings. Rather, what is so inextricably intertwined with how the Legislature and Mental Health Board respond to the revelations of this litigation is the very preservation of human life and dignity . . . In the event, though, that the Legislature fails to satisfy its well-defined constitutional obligation, and the Mental Health Board, because of lack of funding or any other legally insufficient reason, fails to implement fully the standards herein ordered, it will be necessary for the Court to take affirmative steps, including appointing a master, to ensure that proper funding is realized and that adequate treatment is available for the mentally ill in Alabama.' 344 F.Supp. at 377-378. See also 344 F.Supp. at 393-394. (These separate orders cover the three institutions involved.)
 
 
 48
 To the latter statement, the district court added in a footnote, 344 F.Supp. at 378, n. 8:
 
 
 49
 'The Court understands and appreciates that the Legislature is not due back in regular session until May, 1973. Nevertheless, special sessions of the Legislature are frequent occurrences in Alabama, and there has never been a time when such a session was more urgently required. If the Legislature does not act promptly to appropriate the necessary funding for mental health, the Court will be compelled to grant plaintiffs' motion to add various State officials and agencies as additional parties to this litigation, and to utilize other avenues of fund raising.' See also 344 F.Supp. at 394, n. 14.
 
 
 50
 The district court ordered that defendants file within six months a detailed report on the implementation of the stipulated standards.
 
 
 51
 The serious constitutional questions presented by federal judicial action ordering the sale of state lands, or altering the state budget, or which may otherwise arise in the problem of financing, in the event the governing authorities fail to move in good faith to ensure what all parties agree are minimal requirements, should not be adjudicated unnecessarily and prematurely. See Ashwander v. Tennessee Valley Authority, 1936, 297 U.S. 288, 346-348, 56 S.Ct. 466, 80 L.Ed. 688, 710-712 (Brandeis, J., concurring); cf. Hawkins v. Town of Shaw, 5 Cir. (en banc), 1972, 461 F.2d 1171; Holt v. Sarver, 8 Cir., 1971, 442 F.2d 304, 309. Since we have now affirmed that part of the district court's orders recognizing the constitutional right to treatment, determination of good faith efforts by state authorities to ensure these rights should be made in the first instance in the district court.
 
 
 52
 In any event, as a jurisdictional matter dictated by federal statute, remedies of the type contemplated in the district court order of April 13, 1972 are required to be determined by a district court of three judges. Any federal decree that state lands be sold or legislative appropriations be reallocated or enjoined would involve state laws of statewide significance within the purview of 28 U.S.C.A. 2281. The federal injunctive decree which might be entered in such circumstances is required to be that of a three-judge district court. Sands v. Wainwright, supra, 491 F.2d 417. We of course make no prejudgment as to the appropriateness of any such remedial order. Moreover, depending on the improvements made or in progress, such remedies may be unnecessary.
 
 
 53
 This court views as serious a state's failure to ensure the fulfillment of appellees' constitutional rights, but the interests of all concerned, and the sensitivities of our federal system, will be best served by the parties, amici, and court moving together to meet the constitutional requisites. This is the nature of the remedy ordered by this court in Hawkins v. Town of Shaw, supra, 461 F.2d at 1174. This appears to be the meaning and intent of the district court's recognition of the function of the Alabama legislature within the Alabama governmental framework, and the court's orders of April 13, 1972 requiring reports on compliance with the stipulated standards.
 
 
 54
 This approach should hasten the day when the district court can be reasonably assured that appellees' constitutional rights are no longer being violated, and when ultimate control over the institutions in question can be returned to the state. Cf. Holt v. Sarver, supra, 442 F.2d at 309.
 
 V.
 
 55
 We reserve decision on the issue presented by the awards of attorneys' fees to plaintiffs pending decision in No. 73-1790, Gates v. Collier; No. 73-2033, Newman v. State of Alabama; and Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department, en banc, argued and submitted on October 2, 1974. See 28 U.S.C.A. 2106 for the authority to reserve decision.
 
 
 56
 Affirmed in part; remanded in part for further proceedings not inconsistent herewith; and decision reserved in part.
 
 
 
 [1]
 'Treatment' menas care provided by mental health professionals and others that is adequate and appropriate for the needs of the mentally impaired inmate. Treatment also encompasses a humane physical and psychological environment. The term 'habilitation', used by the parties and amici in the district court and by the district court in its order of April 13, 1972 (Partlow State School and Hospital) is a term used to describe that treatment which is appropriate to the condition of the mental retardate. For convenience, in this opinion we group 'habilitation' and 'treatment' under the single term 'treatment', and to include those instances where rehabilitation is impossible in which event the requirement is minimally adequate habilitation and care, beyond the subsistence level custodial care that would be provided in a penitentiary. Donaldson v. O'Connor, 5 Cir., 1974, 493 F.2d 507, 522
 
 
 [2]
 The 99 employees included 41 who were assigned duties such as food service, maintenance, typing and other mechanical duties not involving direct patient care; 26 persons involved in planning social and other recreational activities for the patients; nine persons from the department of psychology; eleven from the social service department; three registered nurses, two physicians, one dentist, and six dental aides
 
 
 [3]
 By order entered August 20, 1971, the district court granted the motion filed by the American Civil Liberties Union, the American Orthopsychiatric Association, the American Psychological Association, and the American Association on Mental Deficiency, for leave to appear as amici. In this Court, these amici have been joined by the National Association for Mental Health, the American Psychiatric Association and the National Association for Retarded Children. The seven have filed a joint brief in this Couirt
 The district court expressed its gratitude to these organizations for their valuable assistance in this difficult and complex case, 344 F.Supp. 375, 390, and we do so, too.
 
 
 [4]
 At the conclusion of the Partlow hearing, the district court entered an emergency order requiring the defendants to take certain immediate actions at Partlow. These included the installation of an emergency light system and procedures for emergency evacuation; revision of sanitation measures in the kitchen; revamping of its program for the use of drugs; conducting appropriate immunizations; and employing three hundred additional resident care workers. In its order filed March 2, 1972, the court said it was taking these steps 'to protect the lives and well-being of the residents', because it found Partlow to be a 'warehousing institution . . . wholly incapable of furnishing treatment to the mentally retarded and . . . conducive only to the deterioriation and debilitation of the residents', and because it found conditions at Partlow 'substandard to the point of endangering the health and lives of the residents'
 
 
 [5]
 In both orders, the court refused requests made by plaintiffs and amici to appoint a master and professional advisory committee to oversee implementation of the standards on grounds that 'federal courts are reluctant to assume control of any organization, but especially one operated by a state'. 344 F.Supp. at 377, 392-393. The court also, in both orders, reserved ruling on various motions by the plaintiffs to ensure adequate financing for the implementation of the standards. These included a motion that the Mental Health Board be directed to sell or encumber its extensive land holdings, and a motion for an injunction against the expenditure of state funds on any 'nonessential' functions until the standards were fully implemented
 
 
 [6]
 One of the four died after a garden hose had been inserted into his rectum for five minutes by a working patient who was cleaning him; one died when a fellow patient hosed him with scalding water; another died when soapy water was forced into his mouth; and a fourth died from a self-administered overdose of drugs which had been inadequately secured
 
 
 [7]
 In raising the issue in this Court, the appellants contend that, because there is no constitutional right to treatment, the district court lacked jurisdiction over the suit. In so arguing the issue, the appellants are following, on this point as one the other four of their first five contentions, the decision of the Northern District of Georgia in Burnham v. Department of Public Health, 1972, 349 F.Supp. 1335, appeal docketed, No. 72-3110, 5 Cir., Oct. 4, 1972. In Burnham, the court held that the Constitution does not guarantee a right to treatment. It then held that the consequence of this conclusion was that it was without jurisdiction over the suit, because 28 U.S.C. 1343(3), the asserted basis of jurisdiction, confers jurisdiction only over 'action(s) . . . to redress the deprivation' of a 'right, privilege, or immunity' secured by the Constitution or by an Act of Congress providing for equal rights
 
 
 [8]
 Governor Wallace borrows the term 'true clients' from the work of Professor Erving Goffman. E. Goffman, Asylums-- Essays on the Social Situations of Mental Patients and Other Inmates 384 (1961). Governor Wallace in his brief praises Professor Goffman as a 'realistic writer'. Be that as it may, it is fairly clear that Professor Goffman's intent, in calling 'relatives, police, and judges' the 'true clients of the mental hospitals' was critical, indeed harshly so, and that Professor Goffman was insinuating by that statement an embarrassing, though rarely admitted, truth about the institutionalization system in the United States. What Professor Goffman implied was morally unacceptable-- that the convenience of relatives and law enforcers justifies stripping away all of the liberties of the civilly committed we hold today is constitutionally unacceptable
 
 
 [9]
 See 86 Harv.L.Rev. 1282, 1305 (1973)
 
 
 [10]
 The parties and amici submitted in two Memoranda of Agreement stipulations of standards of adequate care. Virtually all of the specifics of the district court's April 13, 1972 orders were taken from these stipulations. These standards have not been challenged on appeal. Indeed, Governor Wallace's brief to this court begins with the affirmation: 'We wish to emphasize at the outset that this appellant, Governor George C. Wallace, is in full and complete agreement with the ultimate achievement of the standards and goals for mental health facilities which are set forth in the District Court's order(s) of April 13, 1972.' Brief of Appellant, p. 1
 
 
 [11]
 As noted, supra, however rare they may be, federal decrees mandating affirmative action expenditures by state governing authorities to ensure constitutional guarantees are not unprecedented in cases involving equal protection and also cruel and unusual punishment. E.g., Griffin v. County School Bd., 1964, 377 U.S. 218, 233, 84 S.Ct. 1226, 12 L.Ed.2d 256, 266; Swann v. Charlotte-Mecklenburg Md. of Educ., N.D.N.C., 1970, 311 F.Supp. 265, 268, vacated and remanded on other grounds, 4 Cir. (en banc), 431 F.2d 138, order reinstated, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; United States v. Plaquemines Parish School Bd., E.D.La., 1967, 291 F.Supp. 841, aff'd as modified, 5 Cir., 1969, 415 F.2d 817; Cruz v. Beto, 1972, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263; Holt v. Sarver, 8 Cir., 1971, 442 F.2d 304; Nelson v. Heyne, 7 Cir., 1974, 491 F.2d 352; Gautreaux v. Chicago Housing Auth., N.D.Ill., 1969, 296 F.Supp. 907, aff'd, 7 Cir., 1970, 436 F.2d 306, cert. denied, 1971, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661
 See also cases cited Note, Right To Treatment, 1973, 86 Harv.L.Rev. 1282, 1300, nn. 98-104; Development in the Law, Civil Commitment of the Mentally Ill, 1974, 87 Harv.L.Rev. 1338, n. 96; Comment, Enforcement of Judicial Financing Order; Constitutional Rights in Search of a Remedy, 1970 59 Geo.L.J. 393.