**BETH V., a Minor, et al.**

v.

**Donald M. CARROLL, Jr., et al.**

**Civ. A. No. 93–4418.**

United States District Court, E.D. Pennsylvania.

May 31, 1994.

**530**

Mary Gay Scanlon, Philadelphia, PA, for plaintiffs.

Claudia M. Tesoro, Office of Atty. Gen., Philadelphia, PA, Marsha S. Edney, Dept. of Justice–Civil Div., Fed. Programs Branch, Washington, DC, for defendants.

## MEMORANDUM

ANITA B. BRODY, District Judge.

Before me is the plaintiffs' motion for class certification, to which the defendant has stipulated. The larger issue, however, is what my role as a federal judge should be in this litigation.

The plaintiffs, several children who need special education and their parents or guardians, challenge Pennsylvania's administration of the Division of Compliance ("DOC"), the agency that handles complaints about special education programs for the Pennsylvania Department of Education. The plaintiffs seek to represent a class of such children and their parents, who have filed or will file complaints with the DOC, and whose complaints have not been or will not be responded to in a timely and thorough fashion. The plaintiffs seek declaratory and injunctive relief; specifically, they seek an order requiring the Department of Education to provide the DOC with sufficient resources to enable it to review complaints more quickly and to provide more follow up action to ensure that the problems are truly remedied.

The parties have submitted a stipulation regarding class certification for my approval. Counsel have also informed me that they have had substantial settlement discussions and hope to negotiate a consent decree in the near future, which would require the state to provide a certain number of case reviewers and ensure a certain level of follow up on complaints. I could, if I felt that I had enough information to make such a determination at this point, sign the stipulation and certify the class. I could also schedule a hearing on class certification and ask the plaintiffs to present evidence, which would obviously be uncontested, that this class meets the requirements of Fed.R.Civ.P. 23. I do not feel that either of these alternatives would satisfy my obligation as a federal judge to make an independent and informed decision about class certification, and am concerned that the same dilemma will recur when and if the parties submit a consent decree for my approval. For the reasons set out in this opinion, I will appoint a special master to investigate the plaintiffs' claims and request for class certification and make recommendations to me, first, as to the propriety of class certification, and second, if necessary, as to any proposed consent decree.

## I. The Broader Picture

Modern federal court public law litigation is not the battle of champions that it once was. Eighteen years ago Professor Chayes of Harvard Law School wrote of the changing nature of litigation:

> We are witnessing the emergence of a new model of civil litigation and, I believe, our traditional conception of adjudication and the assumptions upon which it is based provide an increasingly unhelpful, indeed misleading framework for assessing either the workability or the legitimacy of the roles of judges and court within this model.

Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L.Rev. 1281, 1282 (1976) (*"Role of the Judge"*). The evolution of this "new model" of civil litigation, and particularly the more frequent use of class actions, reflects "our growing awareness that a host of important public and private interactions ... are conducted on a routine or bureaucratized basis and can no longer be visualized as bilateral transactions between private individuals." Chayes, *Role of the Judge*, 89 Harv.L.Rev. at 1291.

Chayes noted several ways in which modern public law litigation diverges from the traditional model of litigation:

> 1. The subject matter of the lawsuit is not a dispute between private individuals

about private rights, but a grievance about the operation of public policy.

2. The scope of the lawsuit is shaped primarily by the court and the parties, rather than being inherently defined by the cause of action.

3. The party structure is not rigidly bilateral; it is sprawling and amorphous.

4. The fact inquiry is not historical and adjudicative but predictive and legislative.

5. Relief is not limited to compensation for past wrongs, and the impact of the remedy is not confined to the immediate parties; instead, the remedy is forward looking, fashioned along flexible and broad remedial lines, and often has important consequences for many persons not before the court.

6. The remedy is not imposed; it is negotiated.

7. The decree often does not terminate judicial involvement in the matter.

8. The judge is not passive, her function limited to analysis and statement of governing legal rules; she is active, with responsibility not only for credible fact evaluation, but also for organizing and shaping the litigation to ensure a just and viable outcome.

Chayes, *Role of the Judge*, 89 Harv.L.Rev. at 1302.

Modern public law litigation, with its flexible structure and powerful remedy—the injunction or consent decree—has proved a powerful tool. Some have welcomed this development and others caution that such a powerful tool can also be used recklessly or irresponsibly. The potential of this tool for use and misuse, both in great measure, puts enormous responsibility upon a judge before whom such a case is litigated.

Examples of the advancement of individual rights through public law litigation are ubiquitous: school desegregation, the respectful treatment of mentally ill and mentally retarded individuals, the humane treatment of prisoners, and a host of other worthy causes have been advanced through public law liti-

gation. Unfortunately, the potential for misuse is just as common. In 1976, the same year that Professor Chayes described the public law model of litigation as the "Triumph of Equity", Professor Blumstein of Vanderbilt Law School warned of the dangers inherent in a federal judge's use of broad remedial orders, and the accompanying implications for the court's integrity and effectiveness.[1] *See* James F. Blumstein, *Constitutional Perspectives on Governmental Decisions affecting Human Life and Health*, 40 Law & Contemp.Probs. 231, 300 (1976) (hereinafter, *Constitutional Perspectives* ).

Professor Blumstein expressed particular concern about "the necessarily narrow expanse of a court's analytical horizon". Blumstein, *Constitutional Perspectives*, 40 Law & Contemp.Probs. at 300. The implementation of an injunction or consent decree could require massive state expenditures, forcing the state to either curtail other worthwhile programs or raise taxes, but the court does not grapple with those decisions. "Courts deal with live cases and controversies which center on the grievances of specific parties and their particularized constitutional claims.... They do not take evidence on [funding] issues, have jurisdiction only over the parties to a lawsuit, and have fewer guideposts [than state officials who routinely make decisions about the allocation of state resources] for determining either what should be given up in order to effectuate a decree or how much must be spent to remedy a constitutional violation." Blumstein, *Constitutional Perspectives*, 40 Law & Contemp.Probs. at 300–01. Blumstein argues that decisions about funding priorities should be made by the politically accountable branches of state government, and not imposed by federal courts. Blumstein, *Constitutional Perspectives*, 40 Law & Contemp.Probs. at 301–03.

Ideally, the fact that the State is a party to the litigation should ensure that the decree, especially a negotiated one, does not impose a legal or financial burden that the State is unwilling or unable to meet. However, there

---

**1.** Professor Blumstein is my younger brother. Obviously, our minds run along the same track— he's just a little precocious.

are several instances in which this check does not operate properly.

The first is when a defendant department sees a lawsuit as "an opportunity for it to secure more funds than it might otherwise receive in the budget derby and therefore look[s] on the suit as a friendly one". Blumstein, *Constitutional Perspectives*, 40 Law & Contemp.Probs. at 301. At the least, professionals within a defendant department who are frustrated by the compromises that result from the competition with other claims for scarce resources may welcome an opportunity to dramatize, and perhaps exaggerate their needs in a forum where theirs is the only financial claim under scrutiny. Blumstein, *Constitutional Perspectives*, 40 Law & Contemp.Probs. at 302. At the worst, the court's inability to weigh competing claims for resources creates the "possibility that the judiciary will be used by dissatisfied bureaucrats as an end-run around normal budget-making procedures," resulting in collusive lawsuits between special interest groups and state agencies. Blumstein, *Constitutional Perspectives*, 40 Law & Contemp.Probs. at 301. There are many examples of such "sweetheart suits", most of which did *not* begin as outright collusion, but nonetheless end with the parties drawing up a "wish list" for the court to approve and the state to finance. *See* Blumstein, *Constitutional Perspectives*, 40 Law & Contemp.Probs. at 301–02 nn. 439, 443 (collecting cases).

Another instance in which having the government as a party may not provide the expected check on the scope and cost of a negotiated remedy is when an outgoing administration negotiates a consent decree that it will not have to abide by. The dangers of that situation were amply illustrated in *United States v. Board of Education of Chicago*, 717 F.2d 378 (7th Cir.1983), *Alliance to End Repression v. City of Chicago*, 742 F.2d 1007 (7th Cir.1984), and *Women's Equity Action League v. Bell*, 743 F.2d 42 (D.C.Cir.1984), all of which involved consent decrees negotiated by the Carter Administration and resisted by the Reagan Administration. *See discussion in* Jeremy A. Rabkin and Neal E. Devins, *Averting Government by Consent Decree: Constitutional Limitations on the Enforcement of Settlements with the Federal Government*, 40 Stan.L.Rev. 203, 246–64 (1987).

In these situations, the weakening of the traditional adversary relationship between the parties may result in a decree which the defendant department is happy to sign, but with which the broader administration or the successor administration has no intention of complying. That administration may seek to have the decree vacated as collusive, as occurred in *Simer v. Rios*. *See Simer v. Rios*, 661 F.2d 655, 659–60 (7th Cir.1981) (summarizing case history), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982). Alternatively, the administration may simply refuse to implement the decree. A battle with a resistant bureaucracy costs the plaintiff its settlement, reduces respect for the court, and threatens the court's effectiveness in enforcing the Constitution. As Professor Blumstein noted, state and local governments are particularly well-equipped to resist orders to allocate funds:

> Since courts do not have authority to raise funds on their own or even to shift funds from one department to another unless both units are joined as parties in a lawsuit, they must ultimately rely on defendant agencies and state governments to acquiesce, either out of respect or through intimidation. Where courts impose allocation priorities, they therefore risk impairing their own institutional credibility and their political stature if a recalcitrant defendant refuses to appropriate sufficient funds or otherwise aggressively resists judicial action. Such defendants who vigorously oppose implementation of judicial decrees ... have a potent political weapon that could help undermine public support for court interventions. They can place the court in a very unfavorable light by closing out popular and visible programs ... in order to galvanize popular opposition to judicial action.

Blumstein, *Constitutional Perspectives*, 40 Law & Contemp.Probs. at 303 n. 450.

▪ Of course, budgetary factors are not an excuse for failing to remedy a constitutional violation. *See Wyatt v. Aderholt*, 503 F.2d 1305, 1315–14 (5th Cir.1974). But con-

sent decrees can and often do go beyond the minimum required by the law, and it is in that gray area between what is strictly necessary to correct the violation and what would create a model operation that the court is most likely to invade the funding prerogatives of the politically accountable branches of government. *See Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 3076, 92 L.Ed.2d 405 (1986). The court's responsibility to the interests of absentees in individual suits for injunction has always been recognized to some extent by the requirement that a judge consider the public interest before issuing an injunction. That responsibility is greatest in the context of public law litigation, where the decree, both by design and incidentally, will impact upon so many more people.

A number of legal scholars and judges have cautioned that the lack of clear guidelines for the drafting and implementation of consent decrees, combined with the broad discretion vested in federal district courts, raise questions about the legitimacy of judicial involvement in this process. I believe that those questions are not motivated by opposition to the substantive results of the litigation or to the use of the federal courts as a vehicle for social and economic reform, but stem from a genuine concern and respect for the court, and from the command of the "case or controversy" limitation on federal judicial power contained in Article III of the United States Constitution. I also believe, with Professor Blumstein, that those questions are dictated by the ambiguous role that the courts serve in our constitutional scheme:

> This reflects the constant tension between our society's democratic ideals, which dictate political accountability, and its written constitution, which implants the judiciary as a barrier to the potential excesses of rampant majoritarianism, safeguarding basic values from the whims of momentary majorities.

Blumstein, *Constitutional Perspectives,* 40 Law & Contemp.Probs. at 300. As a federal judge, I have an enormous responsibility, consistent with Article III, to use my office well, and consistent with my duty to interpret and enforce the laws, to do good.

## II. *The Reason for My Concern in this Case*

The public law model of litigation has evolved in response to the judge's need for more information. As Chayes pointed out,

> The extended impact of the judgment demands a more visibly reliable and credible procedure for establishing and evaluating the fact elements in the litigation, and one that more explicitly recognizes the complex and continuous interplay between fact evaluation and legal consequence. **The major response to the new requirements has been to shift the responsibility for factfinding increasingly on the trial judge.**

Chayes, *Role of the Judge,* 89 Harv.L.Rev. at 1297 (emphasis added). It is no longer feasible to rely primarily on the litigants to produce and develop factual materials; with the diffusion of the party structure, "fact issues are no longer sharply drawn in a confrontation between two adversaries, one asserting the affirmative and the other the negative.... We may not yet have reached the investigative judge of the continental systems, but we have left the passive arbiter of the traditional model a long way behind." Chayes, *Role of the Judge,* 89 Harv.L.Rev. at 1297–98. This is true even in the absence of the kinds of misuse discussed above; it simply is not realistic to expect any party to play "devil's advocate" against its own interests.

In this litigation, the plaintiffs represent the interests of children receiving special education and their families. The state Attorney General represents the Department of Education, which seeks, as one of its goals, to serve that same population. Loujeania Bost, the head of the DOC, testified in her deposition that her office is seriously understaffed and therefore unable to meet the federal timelines on a large number of complaints. Ms. Bost also testified that the DOC has not had the personnel to perform proper follow up in some cases, and that its efforts at ensuring compliance are hampered both by the staff shortage and by department policies which restrict the DOC's use of its most

potent weapons against recalcitrant school districts.

Essentially, the State has conceded most of the plaintiffs' case. The State is not opposing certification of the plaintiff class, and the parties have been involved in settlement discussion since before I held my first status conference. While I certainly expect the government to admit liability when it is clear, I have no way of evaluating, without any presentation of the other view, whether the plaintiffs are truly entitled to class certification or the remedial order they are seeking.

The Attorney General here represents the interests of the Department, which, to its credit, genuinely seeks to enforce the special education laws. No one here is representing the State Legislature, state budget office, or the taxpayers of Pennsylvania. There is no one before me who is likely to argue that the plaintiffs are not entitled to the relief that they seek, or that they are entitled only to an injunction requiring the state to remedy the deficiencies within a certain period of time or face more detailed directives from the court, or that the Department of Education's current efforts to upgrade the DOC, described by Ms. Bost, merit an inference that the Department is acting in good faith and able to implement a simple injunction.

The Department is, of course, free to act to correct any problems it perceives, and should be encouraged to pay attention to the complaints of constituent groups and to work with them in developing a solution. But before I give such agreements the force of a federal court order, I must make an independent determination of the propriety of class certification and of any consent decree which may be submitted to me. This is the duty of any federal court under Article III's adversary model. For that, I need more information than these parties have provided or are likely to provide to me.

### III. *My Solution*

Fortunately, the Federal Rules of Civil Procedure empower me to seek outside help in such situations. The appointment of a master is not a routine affair, and it is not a step that I take lightly, or without caution. I believe that in this case, the use of a master is appropriate and will not impinge upon my obligation to make an independent decision on the merits.

■ Rule 53 of the Federal Rules of Civil Procedure provides for the appointment of masters in non-jury cases routinely to help with difficult accounting problems, and otherwise "only upon a showing that some exceptional condition requires it". Fed.R.Civ.P. 53(b). The "exceptional condition" in this case is that the interests of the plaintiffs and the defendant agency are so nearly identical that I doubt that the parties will be able to present me with more than a single perspective on key issues. Certainly that has already happened with regard to class certification. Since I cannot make my own factual investigation, and am in a poor position to argue the requirements of Rule 23 with parties who come to me for a disinterested decision, I must appoint a master to perform those functions for me.

■ There has been, quite properly, much concern about the broad delegation of judicial powers to special masters, particularly with regard to the formulation and implementation of consent decrees in institutional reform cases. *See* James S. DeGraw, *Rule 53, Inherent Powers, and Institutional Reform: The Lack of Limits on Special Masters,* 66 N.Y.U.L.Rev. 800 (1991). I want to make it clear that it is not my intention to delegate my decision-making responsibilities to this special master. His or her functions will be investigatory and advisory, not adjudicative. The exact scope of the master's powers and responsibilities will be set out in a subsequent order of appointment.

This is not a novel solution; it is one which Professor Chayes endorsed when he wrote of the benefits and burdens (the latter being primarily upon the judge) of this "new model" of public law litigation:

> The judge is the dominant figure in organizing and guiding the case, and [s]he draws for support not only on the parties and their counsel, but on a wide range of outsiders—masters, experts, and oversight personnel.

Chayes, *Role of the Judge,* 89 Harv.L.Rev. at 1284.

## VI. *Conclusion*

The position of a federal judge is a very serious responsibility because of both the influence that the judge wields and the limitations that the office imposes. Because of this, I want to take every precaution to ensure that I do not put my imprimatur upon a decree which is not fully supported by the law and the facts. I believe that the way to prevent that from happening here is to invoke my powers under Rule 53 to seek assistance from a disinterested person who is not limited to adjudication of the facts and issues as they are presented by others. An order of appointment will follow. It will provide the name of the special master and set out his or her specific powers and responsibilities, as well as his or her rate of compensation, to be paid by the defendant.