BETH V., A Minor, By her Parent and
Natural Guardian, YVONNE V., et
al.

v.

Donald M. CARROLL, Jr., Secretary
of Education, Commonwealth of
Pennsylvania, et al.

Civ. A. No. 93–4418.

United States District Court,
E.D. Pennsylvania.

Feb. 14, 1995.

Alyssa R. Fieo, Morgan Lewis & Bockius, Janet F. Stotland, Mary Gay Scanlon, Philadelphia, PA, for plaintiffs.

Claudia M. Tesoro, Office of Atty. Gen., Philadelphia, PA, Marsha S. Edney, Dept. of Justice, Civil Div., Fed. Programs Branch, Washington, DC, Alfred W. Putnam, Jr., Special Master, Drinker, Biddle & Reath, Philadelphia, PA, for defendants.

*AMPLIFIED OPINION PURSUANT TO THIRD CIRCUIT RULE 3.1* [*]

ANITA B. BRODY, District Judge.

This is an action to enforce compliance with federal regulations located at 34 C.F.R. §§ 300.660–.662 (1993), which set forth certain complaint resolution procedures states must provide under the federal Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1485 (the "IDEA"). Plaintiffs seek to enforce these complaint procedure regulations under the IDEA itself (the "direct IDEA claim" or the "IDEA claim") and under 42 U.S.C. § 1983 (the "section 1983 claim"). Before me are plaintiffs' motions for class certification as to both claims and for summary judgment as to the IDEA claim.

I find that plaintiffs' IDEA and section 1983 claims fail at the threshold because plaintiffs do not have a private right to enforce the particular regulatory provisions at issue here. I decline to imply a right of action in favor of private parties such as plaintiffs directly under the regulations at issue, and I find that, in light of the current efforts of the United States Secretary of Education ("the Secretary") to resolve the very problems that are the impetus for this lawsuit, plaintiffs are foreclosed from enforcing those regulations under 42 U.S.C. § 1983. Accordingly, I will: (i) deny plaintiffs' motion

for summary judgment on the direct IDEA claim, and enter summary judgment on that claim in favor of defendants; (ii) enter summary judgment in favor of the defendants on the section 1983 claim on my own initiative, and dismiss that claim without prejudice to re-assert it, if necessary, when the Secretary's involvement in the matters at issue is terminated or after June 30, 1995, whichever is earlier; and (iii) deny as moot plaintiffs' motion to certify for class treatment the IDEA claim and the section 1983 claim.

## I. ABBREVIATIONS USED IN THIS OPINION

Because this opinion contains more than the usual number of abbreviated terms, I offer the following glossary at the outset for ease of reference:

DOC Division of Compliance (a unit of the Pennsylvania Department of Education)

EDGAR Education Department General Administrative Regulations

IDEA Individuals with Disabilities Education Act

IEP Individualized Education Program

OSEP Office of Special Education Programs (a unit of the United States Department of Education that reports to the federal Secretary of Education)

PDE Pennsylvania Department of Education

SEA State Educational Agency

Secretary United States Secretary of Education

## II. STATEMENT OF UNDISPUTED FACTS

### A. *The Parties and the Claims*

Plaintiffs are several children who need special education and their parents or guardians, and Parents' Union for Public Schools, a public advocacy group that represents disabled children and their families in special education matters. In August of 1993, plaintiffs filed this action against the Pennsylvania

---

[*] This Amplified Opinion is filed pursuant to Third Circuit Local Appellate Rule 3.1. For reasons of style and convenience, phrases articulated in the future tense in my Opinion of January 3, 1995, such as "I will deny," are carried forward in this Amplified Opinion in the same tense. The Appendix attached to the January 3 Opinion has not been reproduced with this Amplified Opinion. [Editors Note: The Appendix is published at 155 F.R.D. 529.]

Department of Education and its secretary, Donald M. Carroll, Jr. (collectively "PDE"), alleging violations of the IDEA, 20 U.S.C. §§ 1400–1485, and its implementing regulations [1]; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulations; and 42 U.S.C. § 1983. Plaintiffs also sued in his official capacity the United States Secretary of Education, Richard W. Riley, but they later dismissed the Secretary from the suit.

Plaintiffs have each filed with PDE administrative, education-related complaints under the Commonwealth's special education system. The gravamen of their claim here is that the Division of Compliance ("DOC"), the unit of PDE responsible for handling such complaints, has failed to maintain a complaint resolution system that complies with certain regulatory requirements now codified under the IDEA at 34 C.F.R. §§ 300.660–.662 (1993). Specifically, plaintiffs cite as the principal deficiencies in DOC's operation the following alleged violations of these regulations: (i) DOC fails to resolve complaints within the required 60–day time limit; (ii) DOC fails to monitor and enforce the corrective action that it orders subordinate agencies to take; and (iii) DOC fails to address all allegations raised in complaints.

Plaintiffs seek declaratory and injunctive relief that is both intrusive and detailed. They ask me to compel PDE to: (i) take immediate measures to ensure that DOC's complaint system meets all applicable requirements, including the 60–day time limit; (ii) devise and submit for my approval a plan to ensure such compliance; (iii) file semi-annual reports with me and with plaintiffs for the next five years addressing, in part, the nature and number of complaints filed, the time necessary to resolve complaints, and the methods used by DOC to resolve complaints; and (iv) publicize the availability and procedures of DOC's complaint system.

1. In this opinion, I refer to both the IDEA and its predecessor statute, the Education for All Handicapped Children Act, as the "IDEA."

2. The OSEP Report requires that PDE execute the following remedial actions, among others:

## B. Proceedings in This Case

On November 15, 1993, plaintiffs moved for certification of the following proposed class as to all claims pursuant to Fed. R.Civ.P. 23(b)(2):

All Pennsylvania children, and their parents and/or other representatives, who since July 1, 1990, have used the [Pennsylvania Department of Education's special education] complaint system, or may in the future use that system.

When I first considered the issue of class certification, I referred the matter to a special master, Alfred W. Putnam, Jr., Esq. (the "Special Master"), for a report and recommendation. The reasons prompting my referral were detailed in my memorandum that accompanied the order. *Beth V. v. Carroll,* 155 F.R.D. 529 (E.D.Pa.1994). On August 31, 1994, the Special Master filed his report, to which both plaintiffs and PDE submitted responses.

Among the Special Master's findings were those concerning the causes of DOC's alleged deficiencies and the status of cooperative efforts undertaken by the Secretary and PDE to remedy the problems. Specifically, the Special Master found that while DOC does have in place procedures that meet federal requirements, PDE concedes that due to understaffing DOC has been unable to meet the 60–day time limit for resolving complaints, which on average require 80 to 90 days to resolve. Report of Special Master, at 3. He also found that, since the commencement of this lawsuit, the federal Office of Special Education Programs ("OSEP"), which reports to the Secretary, has issued a final document (the "OSEP Report") addressing the principal deficiencies of DOC at issue here. *Id.* at 5. After expressly noting DOC's untimeliness and its failure to resolve all allegations, Report of Special Master, App. C, at 8, the OSEP Report concludes with a detailed order to remedy these problems. Report of Special Master, App. C, at 49.[2] Included in this order are (i) specific

(1) PDE must send OSEP a plan for recruiting, scheduling, and retaining personnel to ensure PDE's capability to investigate and resolve all allegations raised in complaints within 60 days from the date they are received (unless timelines have been extended

procedures by which PDE must verify that it has corrected the deficiencies cited and (ii) specific deadlines for complying with the OSEP order. *Id.*

In response to the OSEP Report, the Special Master found, PDE has begun to undertake compliance efforts, producing the following proposals: "Plan for Recruiting, Scheduling and Retaining Personnel to Ensure Investigation and Resolution of Complaints" and "Procedures for Ensuring All Allegations Are Resolved." Report of Special Master, at 7. Observing that PDE hopes to be in compliance with the OSEP Report by early next year, the Special Master reported that OSEP would continue to monitor PDE if necessary, while the Secretary would undertake his periodic compliance review, as mandated by statute. *Id.* at 9.[3]

After the Special Master filed his report, plaintiffs moved for summary judgement on their IDEA claim. On October 25, 1994, I issued an order raising, *sua sponte*, the threshold question of whether a private right of action existed under either the regulatory provisions that plaintiffs seek to enforce or section 1983, and requiring the parties to brief the issue. *Beth V. v. Carroll*, No. 93 Civ. 4418, 1994 WL 594267 (E.D.Pa. Oct. 25, 1994). Both plaintiffs and PDE have submitted papers in response to that order and in reply to each other's submissions.[4]

## III. ISSUES TO BE DECIDED

■ The parties have stipulated to certification of the proposed class, and PDE has admitted the core allegation supporting plaintiffs' summary judgment motion, that is, PDE's inability to resolve complaints within the prescribed 60–day period. Yet I find that plaintiffs' IDEA claim fails at the outset because there is no private right of action to sue on this claim directly under the regulations at issue, nor is there, under the narrow circumstances of this case, an indirect right to sue on it under 42 U.S.C. § 1983.[5] I thus conclude that: (i) summary judgment should be granted in favor of PDE rather than plaintiffs on the IDEA claim; (ii) summary

---

due to the extraordinary circumstances of a particular complaint). The plan must include: (a) procedures necessary to recruit and retain sufficient personnel to conduct full complaint management activities; (b) personnel assigned to conduct complaint management activities to include the name (if known) or title of the individual [and] the specific assignment for each staff person ... (c) training schedules for assigned personnel; and (d) personnel assigned to conduct training sessions, to include the name (if known) or title of the individual [and] the specific training assignment for each individual.

(2) Develop and send to OSEP complaint procedures for ensuring that all allegations raised in complaints are resolved and for documenting the extension of timelines due to the extraordinary circumstances of a specific complaint, and verification that appropriate staff have been trained regarding these procedures.

Report of Special Master, App. C, at 49.

3. Since the filing of the Special Master's report, PDE claims that DOC has come even further in its efforts to address the problems at issue here. PDE advises me that DOC now employs nine complaint investigators and plans to hire an additional seven, for a total of 16. Defs.' Resp. to Pls.' Mot. for Summ.J., at 3. Furthermore, PDE cites an internal document, Basic Education Circular 10-94, as evidence of "a more aggressive position with respect to enforcement and possible sanctions against intransigent school districts." *Id.* at 4.

4. Plaintiffs have moved for summary judgment only on their IDEA claim. They reserved their right to pursue their section 1983 and Rehabilitation Act claims if they so choose. Pls.' Mot. for Summ.J., at 1 n. 1. Nonetheless, I treat plaintiffs' responses to my order of October 25, 1994, calling for briefing of, *inter alia,* the section 1983 claim as pursuit of that claim, and I address it here as well. *See* Section III, *infra.* I do not address the Rehabilitation Act claim, as it has not been pressed, nor have I raised questions concerning it.

5. The question of whether a private right of action exists is properly raised *sua sponte. See Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 682 F.2d 459, 460 (3d Cir.1982) (noting that district court, *sua sponte,* raised and decided issue of private right of action, but reversing based on interim developments in substantive law); *Thompson v. Kerr,* 555 F.Supp. 1090, 1097 n. 8 (S.D.Ohio 1982) (proper for court to raise, *sua sponte,* issue of private right of action); *International Union, UAW v. National Right to Work Legal Defense & Educ. Found., Inc.,* 433 F.Supp. 474, 483–84 (D.D.C.1977) (deciding, *sua sponte,* that no private right of action existed under statute at issue), *aff'd in part, vacated in part on other grounds,* 590 F.2d 1139 (D.C.Cir.1978).

judgment should be granted for defendants on plaintiffs' section 1983 claim, and that claim should be dismissed without prejudice; and (iii) I need not address the class certification issues with respect to these claims because such certification issues are moot.

Summary judgment is appropriate where there are no disputed material facts. *E.g., Aetna Casualty & Surety Co. v. DeBruicker,* 838 F.Supp. 215, 217 (E.D.Pa.1993), *aff'd,* 30 F.3d 1484 (3d Cir.1994). As developed below, the foregoing facts regarding OSEP's involvement in this case and the results of that involvement, largely findings of the Special Master, are the only facts necessary to resolve the dispositive private right of action questions in this case.[6] These facts are not contested. As to the Special Master's findings based on the OSEP Report, plaintiffs themselves cite that report in support of their summary judgment motion. *See* Pls.' Proposed Findings of Undisputed Facts ¶ 67 (describing noncompliance found by OSEP and documented in OSEP Report), ¶¶ 79–80 (description of OSEP audit and of finding in OSEP Report that DOC fails to resolve all allegations raised in complaints). Nor do plaintiffs take issue with the fact that PDE has produced in response to the OSEP Report the above-mentioned documentary proposals regarding recruiting and procedures for full complaint resolution. Report of Special Master, at 7. Because these particular findings are not contested, I find that a hearing upon them is not necessary, and I hereby adopt them.[7] Plaintiffs also accept PDE's representations, · *supra,* at n. 3, concerning its more aggressive enforcement posture of late. *See* Pls.' Reply to Defs.' Resp. to Pls.' Mot. for Summ.J., at 8 n. 9 ("Plaintiffs applaud any recent efforts by DOC to reform its practices and procedures."). Finally, plaintiffs have not disputed PDE's update as to hiring developments. *See supra,*

at n. 3. What plaintiffs dispute, of course, is the legal import of these facts.

■ Where, as here, a court is already "engaged in the process of determining whether there is a genuine issue of material fact, and the parties have had the opportunity to present evidence on the issues," the weight of authority allows summary judgment in favor of a nonmovant such as PDE if warranted. *Weil Ceramics & Glass, Inc. v. Dash,* 618 F.Supp. 700, 716 (D.N.J.1985) (citing 10A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice & Procedure* § 2720 (1983), *rev'd on other grounds,* 878 F.2d 659 (3d Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence."); *Caputo v. Fauver,* 800 F.Supp. 168, 172 (D.N.J.1992) (similar), *aff'd,* 995 F.2d 216 (3d Cir.1993). Here, plaintiffs initiated my consideration of the issues by moving for summary judgment on the IDEA claim. Because I felt that the parties had overlooked the threshold question of whether a private right of action existed under the regulations at issue or under section 1983, I specifically requested that this question be addressed. *Beth V. v. Carroll,* No. 93 Civ. 4418, 1994 WL 594267 (E.D.Pa. Oct. 25, 1994). Plaintiffs then briefed this question thoroughly, appreciating the significance, I must presume, of all uncontested facts in the record that bear upon it. There can be no assertion that plaintiffs were not put on notice of the possibility that this case might be decided against them on the grounds that no private right of action exists here to enforce the regulations at issue. Thus, as a procedural matter, summary judgment may be granted against

---

**6.** Even these facts are only necessary for the section 1983 portion of the discussion. *See infra.*

**7.** *See Hepner v. Chozick,* 296 F.2d 595, 596 (D.C.Cir.1961) (district court did not abuse discretion when it adopted master's findings upon consideration of pleadings, report, record, and various memoranda, without holding hearing or receiving further evidence); *cf. United States v.*

*Local 86, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers,* Civ. No. 8618, 1971 WL 138, at *1 (W.D.Wash. May 28, 1971) (adopting without hearing report of special master where parties did not object to findings therein and consented to have report considered on current state of record).

plaintiffs and in favor of PDE. *See Weil Ceramics & Glass, Inc. v. Dash,* 618 F.Supp. at 716.

■ Moreover, because I conclude that PDE is entitled to summary judgment on the IDEA and section 1983 claims, I may properly decline to reach the related class certification issues before me and dismiss that motion as moot with respect to those claims. *See Thompson v. County of Medina, Ohio,* 29 F.3d 238, 241 (6th Cir.1994) (court has discretion to decide summary judgment motion before class certification motions where doing so will protect both parties and court from further litigation) (citations omitted); *Bogue v. Vaughn,* No. 91 Civ. 5046, 1993 WL 497851, at *1, *12 (E.D.Pa. Dec. 1, 1993) (granting summary judgment motion and therefore denying class certification motion); *Haas v. Boeing Co.,* No. 90 Civ. 7414, 1992 WL 221335, at *8 (E.D.Pa. Sept. 4, 1992) (granting summary judgment motion and denying as moot class certification motion), *aff'd,* 993 F.2d 877 (3d Cir.1993).[8] Thus, I confine my discussion to the dispositive questions of whether private parties such as plaintiffs may, in the circumstances presented here, sue to enforce the regulatory provisions at issue, under either the regulations themselves or 42 U.S.C. § 1983.

## IV. OVERVIEW OF THE STATUTE AND REGULATIONS

### A. *The Statute*

■ The IDEA is a comprehensive legislative scheme that furnishes federal funds to states to assist in providing special education and related services to children with disabilities. It represents the current state of Congressional efforts spanning nearly three decades to promote the education of disabled children, and was enacted to combat the perception that a majority of such children "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough

to 'drop out.'" H.R.Rep. No. 94–332, 94th Cong., 1st Sess. 2 (1975); *Board of Educ. of Hendrick Hudson Cent. School Dist. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982) (tracing evolution of statute). Recognizing the traditional role of the states in formulating education policy, *Rowley,* 458 U.S. at 208 n. 30, 102 S.Ct. at 3051 n. 30, Congress adopted an essentially cooperative structure, "implicat[ing] fundamental principles of state/federal relations" and aptly described as "cooperative federalism." *Norton School Comm. v. Massachusetts Dep't of Educ.,* 768 F.Supp. 900, 902 (D.Mass.1991) (citing *Burlington v. Department of Educ.,* 736 F.2d 773, 783 (1st Cir. 1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

■ As a condition of funding under the IDEA, states must have in effect a policy that executes the principal goal of the act, which is to "assure[ ] all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1); *Oberti v. Board of Educ. of Borough of Clementon School Dist.,* 995 F.2d 1204, 1213 (3d Cir. 1993). That policy must be reflected in a state plan submitted to and approved by the Secretary, which describes in detail the goals, programs and timetables with respect to the education of disabled children in the state. 20 U.S.C. § 1413; *Rowley,* 458 U.S. at 181, 102 S.Ct. at 3037. Participating states must also provide certain assurances to the Secretary as a condition of funding, including the assurance that (i) the state-level agency charged with administering the IDEA (the "State Educational Agency" or "SEA") will assume responsibility for compliance with the IDEA's terms and (ii) all IDEA-funded programs under the administration of local- and intermediate-level education agencies within the state will be placed under the general supervision of the State Educational Agency. 20 U.S.C. § 1412. If states are found not in compliance with the mandates of the statute, the Secretary is

---

**8.** Plaintiffs' class certification motion embraced all their claims, including the one under the Rehabilitation Act. I do not dismiss the class certification motion with respect to the Rehabilitation Act claim because I do not address that claim at all here. I will, however, exercise my

discretion and defer any ruling upon the motion to certify that claim until arguments on that claim are further developed such that I can determine the appropriateness of summary judgment on it. *See Thompson v. County of Medina, Ohio,* 29 F.3d at 241.

authorized to begin proceedings leading to a termination of funding. 20 U.S.C. § 1416. A state whose funding is so terminated may seek review of the Secretary's decision in the federal Court of Appeals for the circuit encompassing that state. 20 U.S.C. § 1416.

■ The "centerpiece" of the IDEA is the "individualized education program," or IEP, which consists of a detailed statement "summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive." *Polk v. Central Susquehanna Intermediate Unit,* 853 F.2d 171, 173 (3d Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989). To protect the integrity of the process surrounding the IEP, the primary educational vehicle under the statute, the IDEA contains elaborate procedural machinery. The most prominent aspect of this machinery is the "due process" hearing procedure, which allows for prosecution of complaints about any aspect of the IEP process. 20 U.S.C. § 1415(b)(2). This procedure provides for an initial hearing and administrative appeal, 20 U.S.C. § 1415(c), and culminates in the right to an appeal to a federal district court or state court. 20 U.S.C. § 1415(e)(2).[9] Thus, for grievances arising out of the due process system, there is an express right to bring an action in federal court. 20 U.S.C. § 1415(e).

B. *Administrative Provisions*

Comprising a supporting administrative mechanism are the complaint resolution procedures at issue here. *See, e.g., Hoeft v. Tucson Unified School Dist.,* 967 F.2d 1298, 1308 (9th Cir.1992) (complaint resolution procedures comprise administrative scheme separate from due process procedures); *Stauffer v. William Penn School Dist.,* 829 F.Supp. 742, 744 n. 4 (E.D.Pa.1993) (same); *see generally* Judith Welch Wegner, *Educational Rights of Handicapped Children: Three Federal Statutes and an Evolving Jurisprudence. Part II: Future Rights and Remedies,* 17 J.L. & Educ. 625, 690–91 (1988) (discussing administrative alternatives under predecessor of IDEA) [hereinafter, *"Future Rights and Remedies "*]. In part, these procedures require State Educational Agencies to adopt written procedures for receiving and resolving complaints, to conduct on-site investigations if necessary, and to resolve complaints within 60 days absent exceptional circumstances. 34 C.F.R. §§ 300.660–.661 (1993). A complainant is expressly afforded the right to request review of the State Educational Agency's decision by the United States Secretary of Education. 34 C.F.R. § 300.661(d).

■ These complaint resolution procedures have undergone three distinct codification phases. Originally, they were promulgated under the IDEA's predecessor statute and located at 45 C.F.R. § 121.109 (1972),[10] then moved to 45 C.F.R. § 121a.14 (1975),

9. Federal regulations establish time limits for decisions on complaints being heard through this due process system. *See* 34 C.F.R. §§ 300.512(a)(1), 300.512(b)(1).

10. As originally issued in 1972, the regulation read as follows:
§ 121.109 Adoption of complaint procedures.
(a) Procedures. A State educational agency shall adopt effective procedures for reviewing, investigating, and acting upon any allegations of substance, which may be made by local educational agencies or private individuals or organizations, of actions by State or local educational agencies contrary to the provisions of Part B of the Act or the applicable regulations in this part.
(b) Publication. Such procedures shall be made public by methods specifically designed to inform interested persons (as defined in § 121.108(d).
(c) Designation of officer. The State educational agency shall designate the officers who will receive complaints and comments, who will make initial dispositions regarding them, and who will review such dispositions. The names, office addresses, and telephone numbers of those officers shall be published together with such procedures.
(d) Report. The State educational agency shall submit to the [federal Secretary of Education], together with the description of projected activities required under § 121.104, a report disclosing any allegations of the nature described in paragraph (a) of this section, a summary of the result of any investigations made or hearings held with respect to those allegations, and a statement of the disposition by the State educational agency of those allegations. It is recognized that the responsibility with respect to the resolution of these matters rests, in the first instance, in the State educational agency.
45 C.F.R. § 121.109 (1972). Significantly, when first promulgated, the official comment to this regulation noted that it "merely requires that

and later amended and moved to 45 C.F.R. § 121a.602 (1977).[11] In the second phase, they were removed from the statute altogether and re-issued under the Education Department General Administrative Regulations ("EDGAR"), where they were first codified at 45 C.F.R. §§ 100b.780–.781 (1980) and subsequently moved to 34 C.F.R. §§ 76.780–.782 (1983).[12] Finally, they were placed back into the regulations under the IDEA as part of the dismantling of EDGAR, and they are now at 34 C.F.R. §§ 300.660–.662 (1993).[13] *See Mrs. W. v. Tirozzi*, 706 F.Supp. 164, 167–68 (D.Conn.1989) (describ-

ing partial history of complaint resolution procedures); *Laughlin v. School Dist. No. 1, Multnomah County, Or.*, 686 P.2d 385, 390 (Or.App.) (same), *adhered to on reh'g*, 70 Or.App. 219, 689 P.2d 334 (1984), *appeal denied*, 298 Or. 597, 695 P.2d 50 (1985). For the sake of clarity, I will refer to these complaint procedures as the "EDGAR" procedures to distinguish them from the IDEA statutory "due process" procedures described above. I will cite to their current section numbers in the Code of Federal Regulations, however, except where the context requires otherwise.

such procedures exist." 37 Fed.Reg. 14575 (1972).

**11.** This amendment made few substantive changes to the complaint resolution procedures themselves. It was undertaken "to better summarize general administrative and supervisory responsibilities in [20 U.S.C. § 1412(6)] and other sections of the [IDEA]." 42 Fed.Reg. 42,514 (1977). Its major addition of relevance here was a new section embodying minimal requirements under which State Educational Agencies were to develop procedures and timelines for monitoring and evaluating lower-level agencies involved in programs funded under the statute, an addition that was later codified at 45 C.F.R. § 121a.601 (1978) and entitled "Monitoring and evaluation activities." 42 Fed.Reg. 42,514 (1977).

**12.** This "EDGAR" codification phase "was intended to consolidate and streamline federal regulations and to replace duplicative regulations with a single set of regulations applicable to numerous education programs, namely ED-GAR." *Mrs. W. v. Tirozzi*, 706 F.Supp. 164, 168 (D.Conn.1989). At this point in their codification history, the complaint regulations provided, in relevant part, as follows:

> § 76.780 A State shall adopt complaint procedures.
> (a) A State shall adopt written procedures for—
> (1) Receiving and resolving any complaint that the State or a subgrantee is violating a Federal statute or regulations that apply to a program;
> ....
> (3) Conducting an independent on-site investigation of a complaint if the State determines that an on-site investigation is necessary.
> ....
> § 76.781 Minimum complaint procedures.
> A State shall include the following in its complaint procedures:
> (a) A time limit of 60 calendar days after the State receives a complaint—
> (1) If necessary, to carry out an independent on-site investigation; and
> (2) To resolve the complaint.

> (b) An extension of the time limit under paragraph (a) of this section only if exceptional circumstances exist with respect to a particular complaint.
> (c) The right to request the [United States] Secretary [of Education] to review the final decision of the State.
> 34 C.F.R. §§ 76.780–.781 (1984).

**13.** As presently codified, the principal regulation at issue here enlarged upon the second-phase formulation codified at 34 C.F.R. § 76.781, and reads as follows:

> § 300.661 Minimum State complaint procedures.
> Each SEA shall include the following in its complaint procedures:
> (a) A time limit of 60 calendar days after a complaint is filed ... to—
> (1) Carry out an independent on-site investigation, if the SEA determines that such an investigation is necessary;
> (2) Give the complainant the opportunity to submit additional information, either orally or in writing, about the allegations in the complaint;
> (3) Review all relevant information and make an independent determination as to whether the public agency is violating a requirement of part B of the Act or of this part; and
> (4) Issue a written decision to the complainant that addresses each allegation in the complaint and contains—
> (i) Findings of fact and conclusions; and
> (ii) The reasons for the SEA's final decision.
> (b) An extension of the time limit under paragraph (a) of this section only if exceptional circumstances exist with respect to a particular complaint.
> (c) Procedures for effective implementation of the SEA's final decision, if needed, including technical assistance activities, negotiations, and corrective actions to achieve compliance.
> (d) The right of the complainant or the public agency to request the [United States] Secretary [of Education] to review the SEA's final decision.
> 34 C.F.R. § 300.661 (1993).

■ Monitoring SEA compliance with the EDGAR complaint procedures is OSEP, a division of the United States Department of Education. OSEP reviews state plans every three years and also investigates complaints against State Educational Agencies and lower-level state agencies. In the first instance, OSEP refers complaints against lower-level agencies to the relevant SEA. Complaints against SEAs are investigated directly by OSEP. To enforce the statute, OSEP may seek an informal resolution, begin administrative cease-and-desist proceedings, commence proceedings to withhold funds, or request that the Justice Department initiate judicial proceedings to compel compliance. *See* Wegner, *Future Rights and Remedies,* at 690 & nn. 340–343 (citing Letter from Madeleine Will, Asst. Sec., Office of Special Educ. & Rehab. Servs., U.S. Dep't of Educ., to Sen. Paul Trible (July 23, 1986), Educ. Handicapped L.Rep. (CRR) 211:395–98 [hereinafter "Will–Trible Letter"] ).

\* \* \* \* \* \*

With the foregoing in mind, I turn to the question of whether plaintiffs possess a private right of action to enforce the EDGAR provisions at issue here, either directly under those regulatory provisions or indirectly through section 1983. I address these two possibilities *seriatim.*

## V. DIRECT PRIVATE RIGHT OF ACTION TO ENFORCE EDGAR PROCEDURES

■ I must determine whether a private right to enforce the EDGAR regulations at issue should be implied directly under those regulations. The Third Circuit has established and recently confirmed the framework for determining whether a private right of action should be implied under a regulation, laying out a three-pronged test that asks: (i) whether the statute under which the regulation was promulgated permits the implication of private right of action under *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and its progeny; (ii) whether the agency rule is properly within the scope of the enabling statute; and (iii) whether implying a private right of action will further the purpose of the enabling stat-

ute. *In re Corestates Trust Fee Litig.,* 39 F.3d 61, 67–68 & n. 4 (3d Cir.1994) (citing *Angelastro v. Prudential–Bache Sec., Inc.,* 764 F.2d 939, 947 (3d Cir.) *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985)); *accord Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530 (9th Cir.1984). As developed below, I conclude that the EDGAR complaint procedures plaintiffs seek to enforce do not give rise to a private right of action under this test.

### A. *Can a Private Right of Action Be Implied under the Enabling Statute?*

■ The initial inquiry is whether, under *Cort v. Ash* and its progeny, a private right of action can be implied under the enabling statute pursuant to which the EDGAR complaint procedures were promulgated. The test laid down in *Cort* and later cases inquires: (i) whether plaintiffs are part of the class for whose especial benefit the statute was enacted; (ii) whether there was any indication of Congressional intent to deny or create a private right of action; (iii) whether implication of a private right of action is consistent with the underlying purpose of the statute; and (iv) whether the matter is traditionally one relegated to the states. *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2087. The second *Cort v. Ash* factor, legislative intent, is accorded the greatest weight. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979). "Specifically, a lack of evidence of legislative intent to create a private right of action, either express or by implication, can by itself provide the answer that a private right of action should not be implied." *In re Corestates Trust Fee Litig.,* 39 F.3d at 68. The EDGAR regulations themselves, moreover, cannot aid in answering the question of whether a private right of action exists under the enabling statute. *See id.* (citations omitted).

■ Plaintiffs press 20 U.S.C. § 1412(6) as the substantive statutory provision authorizing the EDGAR complaint procedure regulations at issue here. Thus, I concentrate my attention on section 1412(6) and on the legislative intent behind that section. Section 1412(6) provides:

§ 1412. Eligibility Requirements.

In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Secretary that the following conditions are met:

. . . .

(6) The State educational agency shall be responsible for assuring that the requirements of this subchapter are carried out and that all educational programs for children with disabilities within the State, including all such programs administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for children with disabilities in the State educational agency and shall meet education standards of the State educational agency. This paragraph shall not be construed to limit the responsibility of agencies other than the educational agencies in a State from providing or paying for some or all of the costs of a free appropriate public education to be provided children with disabilities in the State.

20 U.S.C.A. § 1412(6).

Both the statute itself and the legislative history are silent as to whether this section confers a private right of action. Plaintiffs claim that legislative intent to confer such a remedy should be inferred from the above-quoted statutory language deputizing the State Educational Agency as the entity responsible for carrying out the provisions of the IDEA and in the legislative history's statement of purpose behind this section. That statement of purpose reads:

[Section 1412(6) ] is included specifically to assure a single line of responsibility with regard to education of handicapped children, and to assure that in the implementation of all provisions of this Act and in carrying out the right to education for handicapped children, the State education-

al agency shall be the responsible agency. . . .

Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and the type of services delivered. While the committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency.

S.Rep. No. 168, 94th Cong., 1st Sess. 24, *reprinted in* 1975 U.S.Code Cong. & Ad. News 1425, 1448.

To be sure, the foregoing statutory language and statement of purpose indicate that Congress intended to centralize responsibility for compliance with the terms of the IDEA at the level of the State Educational Agency. But localizing accountability under the statute ultimately reflects little more than Congress' perceived need to eliminate interagency disputes over service provision responsibility. *See* Dennis E. Cichon, *Educability and Education: Filling the Cracks in Service Provision Responsibility under the Education for All Handicapped Children Act of 1975*, 48 Ohio St.L.J. 1089, 1129 (1987) (describing decentralized system of service provision prior to act and noting that one of main objectives in enacting section 1412(6) was elimination of disputes that arose under such system); *Kruelle v. New Castle County School Dist.*, 642 F.2d 687, 697 (3d Cir.1981) ("Resolution of any interagency conflicts" in coordinating efforts to develop education for disabled child was properly left in hands of state officials). These statements are themselves silent on the question of whether a private remedy was intended to enforce the newly-centralized responsibility.[14]

---

14. Also silent on the private remedy issue are those cases that have found a warrant in section 1412(6) for requiring state-level entities to undertake various tasks and bear various costs related to special education. *See, e.g., Kruelle v. New Castle County School Dist.*, 642 F.2d at 697 (state responsible for funding and coordinating development of IEP for residential placement of se-

verely retarded child); *Christopher T. by Brogna v. San Francisco Unified School Dist.*, 553 F.Supp. 1107, 1116 n. 35 (N.D.Cal.1982) (state responsible for funding residential placement); *Association for Retarded Citizens in Colo. v. Frazier*, 517 F.Supp. 105, 113 (D.Colo.1981) (same). As the facts in these decisions make clear, plaintiffs in each case were proceeding under an

In any event, state responsibility is not the sum total of the legislative message contained in section 1412(6). Integral to the proper understanding of that section is reference to the equally fundamental principles of "cooperative federalism" that underlay the very structure of an intricate scheme designed to provide federal funds in exchange for state-delivered special education that meets federal standards. *See Georgia Ass'n of Retarded Citizens v. McDaniel,* 716 F.2d 1565, 1569 (11th Cir.1983) ("The Act is a model of 'cooperative federalism' in that it offers funds in exchange for the acceptance of certain standards for the education of handicapped children."), *vacated on other grounds,* 468 U.S. 1213, 104 S.Ct. 3581, 82 L.Ed.2d 880 (1984).

 This cooperative federal-state relationship is a "central hallmark" of the IDEA that finds expression in, among other provisions, section 1412(6). *Burlington v. Department of Educ.,* 736 F.2d 773, 783–785 & nn. 6 & 8 (1st Cir.1984) (citing, among other provisions, section 1412(6) as indicative of statute's state-federal partnership; "Congress provided for federal executive oversight through states' annual plans to assure basic compliance with the federal minimum standards, but states supply the machinery to effectuate" those guarantees on a daily basis), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Battle v. Commonwealth*

*of Pa.,* 629 F.2d 269, 277–278 (3d Cir.1980) (policies of federalism have been incorporated into statute through 1412(6)), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). Indeed, the imposition of coordinating responsibility upon the state—apparent from the face of section 1412(6)—itself expresses not just rigid adherence to federal guidelines but also a degree of state autonomy and operational flexibility in the area of compliance. *Cf. Kruelle v. New Castle County School Dist.,* 642 F.2d at 697 ("Rather than rigidly prescribe for the state how various local and state agencies should contribute to the [education of plaintiff], the federal court [pursuant to section 1412(6) ] left such interactions to the discretion of the state officials involved.").[15]

Thus, the legislative intent behind section 1412(6) on the question of private remedies is inconclusive, but the general legislative purpose of that provision is clear: centralized, state-level accountability consistent with substantial state-level autonomy and operational flexibility in matters of compliance. Having discerned this general legislative purpose, I need not continue the analysis under *Cort v. Ash.* For as detailed below, even if I were to find that a private right of action can be implied under section 1412(6), I would nonetheless find, under the final prong of the *Corestates/Angelastro* framework, that impli-

express right to sue, either as part of an IEP-related appeal under the due process provisions of section 1415 or through the collateral remedy of section 1983. Thus, these cases are simply inapposite on the question of implying a direct right of action here.

15. The remaining indications of legislative intent to which plaintiffs direct my attention are not dispositive of the issue either. Plaintiffs contend that Congress expressed its desire to confer private rights of action under section 1412(6) by overruling *Dellmuth v. Muth,* 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989), with enactment of section 1403, which abrogated states' eleventh-amendment immunity from suits under the IDEA. 20 U.S.C. § 1403. Section 1403 does nothing more than make available damages and equitable remedies as against state-level entities properly sued under the IDEA. It says nothing about the prior question of whether a cause of action exists in the first place.

Plaintiffs' suggestion that the requisite intent can be found in Congress' addition of 1415(f) to the IDEA fares no better. With section 1415(f),

Congress amended the IDEA to allow collateral statutory provisions such as 42 U.S.C. § 1983 to augment the existing private enforcement of the IDEA under the due process procedures. In so doing, Congress overruled the virtually absolute bar to the use of section 1983 and other collateral enforcement statutes raised by the Supreme Court in *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). This amendment does not address the applicability of section 1983 or other private remedies to enforce section 1412(6) or any other particular provision, and it certainly does not address the direct implication of a private remedy under section 1412(6). Furthermore, the legislative history of this amendment makes specific mention of the EDGAR complaint procedures at issue here, clarifying that section 1415(f) was not intended to broaden the way for private suits under such procedures. *See* H.R.Rep. No. 296, 99th Cong., 1st Sess., at 7–8 (1985) (it is committee's intent not to modify existing policy regarding the use by parents of EDGAR complaint procedures).

cation of a private right of action to enforce the EDGAR complaint regulations does not further the statute's general legislative purpose as I have extracted it. Consequently, I assume, *arguendo*, that a private right of action can be implied under section 1412(6). I also assume, for present purposes, satisfaction of the second prong of the *Corestates/Angelastro* test, which asks whether the regulations at issue are properly within the scope of the enabling statute, here section 1412(6). *In re Corestates Trust Fee Litig.*, 39 F.3d at 68 n. 4.[16] I therefore turn my attention directly to the final—and here dispositive—prong of the *Corestates/Angelastro* framework.

### B. Does Implication of a Private Right of Action to Enforce the EDGAR Complaint Procedures Further the Purpose of Section 1412(6)?

The final prong of the *Corestates/Angelastro* framework asks whether implication of a private right to enforce the regulations at issue would further the legislative purpose of the enabling statute. I conclude that it would not.

The EDGAR complaint procedures and the larger administrative machinery of which they are a part reflect the IDEA's "basic thrust to create an essentially cooperative federal-state relationship involving transfer of federal funds, in contrast to the more adversarial thrust of the federal civil rights laws." Wegner, *Future Rights and Remedies*, 17 J.L. & Educ. at 695. As such, these procedures implement the flexibility inherent in section 1412(6) as much as they implement that section's message of accountability.

That the EDGAR complaint procedures embody flexibility rather than rigid accountability can be seen from their relative benefits as contrasted to the more formal IDEA due process procedures. Professor Wegner has identified, among others, the following benefits of the EDGAR complaint procedures: (i) these procedures enable coordinating, state-level agencies to deal creatively with funding-related problems experienced by local enti-

ties directly providing educational services, and thereby to shape a remedy often more suitable to the problem at hand, and (ii) these procedures present a dispute-resolution alternative free of the specter of crippling financial burdens associated with attorney's fees and damage awards, or with court-ordered action triggered by local non-compliance. *Id.* at 692, 694. Courts, moreover, have stressed the relative informality of these procedures. *See Association for Community Living in Colo. v. Romer*, 992 F.2d 1040, 1045 (10th Cir.1993) ("The EDGAR procedures are different in both purpose and scope from [the due process procedures] and do not provide parents who file complaints with the same opportunities for a full administrative hearing and judicial review."); *Richards v. Fairfax County School Bd.*, 798 F.Supp. 338, 342 (E.D.Va.1992) (same), *aff'd*, 7 F.3d 225 (4th Cir.1993).

While this adaptability of the EDGAR procedures relates directly to dispute resolution under a properly functioning EDGAR scheme, it also governs questions concerning enforcement of the scheme itself. It would be anomalous indeed if the vaunted flexibility of the EDGAR machinery were defeated by the very attempt to make that machinery operate effectively. Yet that unintended mischief is precisely what private enforcement of the EDGAR procedures threatens to work here. As private enforcers, plaintiffs have only the regulations as written and the cumbersome tool of the wholesale judicial injunction to achieve compliance with the terms of those regulations. A full-scale injunction, insensitive to current staffing and budgetary realities or to decided policy priorities, could quickly paralyze a State Educational Agency such as PDE. *Cf.* Donald L. Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions*, 1983 Duke L.J. 1265, 1289–95 (discussing pitfalls of court-ordered "structural" relief where court must involve itself in budgetary matters largely beyond its institutional competence). Forced to hew immediately to an unrealistically literal application of the com-

---

**16.** Plaintiffs treat this second prong only summarily, and my research has disclosed nothing to make me doubt that the EDGAR regulations at

issue here constitute a proper exercise of delegation under the enabling legislation.

plaint resolution procedures, an SEA bureaucracy would be overwhelmed by the mechanics of compliance. Thus burdened, it would be unable to calibrate its enforcement efforts as dictated by the relative weight of substantive policy goals.[17]

Plaintiffs, however, would have me issue this sort of unwieldy injunction here. This might entangle me in decisions concerning the quintessentially executive tasks of re-cruiting and training personnel, of devising specific methods for complete and timely res-olution of complaints, and of monitoring the effectiveness of these decisions bi-annually for the next five years. Denying that they are doing so, plaintiffs effectively invite me to micro-manage PDE's complaint resolution arm, DOC. I am compelled to decline this invitation.

■ The Secretary, by contrast, is well-suited to the restructuring plaintiffs are seeking for PDE. He is charged by statute with enforcing the assurances required by the IDEA, including assurances concerning the EDGAR procedures. In carrying out this duty, the Secretary is able to exploit a comparatively broader enforcement contin-uum to achieve the necessary degree of com-pliance with the EDGAR complaint regula-tions. Plaintiffs acknowledge only the Secre-tary's funds-withholding authority under 20 U.S.C. § 1416, and argue that such enforce-ment would tear down rather than augment the EDGAR system. Indeed, at least one court appears to have labored under the same impression. *See Mrs. W. v. Tirozzi,* 832 F.2d 748, 757–58 (2d Cir.1987). But judging from the OSEP-administered compli-ance procedures noted above—procedures that have been initiated in this case to order remediation of the very deficiencies at issue here—the probable enforcement scenario is substantially more nuanced. OSEP carries within its quiver arrows other than formal funds-withholding proceedings. These in-clude informal resolution attempts, adminis-trative cease-and-desist proceedings, and Justice Department referrals. *See* Wegner,

*Future Rights and Remedies,* 17 J.L. & Educ. at 690 & nn. 342–343. The existence of the Justice Department referral is particu-larly significant, for it addresses plaintiffs' concern that the Secretary would dismantle rather than enforce the statutory scheme. In OSEP's words, "A distinctive feature of this option is that the intended result would be a *change in the [grant] recipient's behav-ior rather than a cessation of Federal fund-ing."* Will–Trible Letter, Educ. Handi-capped L.Rep. (CRR) 211:397 (emphasis add-ed). The Secretary, moreover, brings to bear on enforcement decisions an institution-al expertise and judgment in special edu-cation matters that no court can replicate in judging the propriety of injunctive or consent decree provisions proffered by litigants in the fray. *Cf.* 3 Kenneth Culp Davis, *Admin-istrative Law Treatise* § 17.1 (2d ed. 1980) (contrasting agency's collective decision-mak-ing process, which reaches a level "higher than that attainable by the ablest administra-tor" acting alone, with federal judge's "al-most entirely personal" decision, which is at best based on consultation with "neophyte" law clerks). As the overseer of experienced professionals with a more varied enforcement arsenal, the Secretary is better positioned than plaintiffs to balance section 1412(6)'s competing objectives of ensuring PDE com-pliance with the EDGAR regulations, on the one hand, and preserving state-level autono-my and flexibility, on the other.

The terms, placement, and evolution of the EDGAR regulations further buttress the conclusion that enforcement of the EDGAR scheme should not, through officious private actions or otherwise, be stripped of agency discretion. Rather, these indicators suggest that EDGAR enforcement decisions should be undertaken in a context that acknowl-edges the presence of some "play in the joints" of the EDGAR scheme. 34 C.F.R. § 300.661(d), for example, allows either party to an EDGAR hearing, the parents or the public agency, to seek review by the Secre-tary of an adverse administrative decision. Review of EDGAR decisions beyond the Sec-

---

17. The specter of a large-scale damages award against an SEA to force compliance with these procedures would likely be equally disruptive. *Cf.* Wegner, *Future Rights & Remedies,* 17 J.L. &

Educ. at 694 (one important feature of EDGAR complaint procedures is that they allow SEAs to avoid constraining effects of financial burdens associated with damages awards).

retary, however, is not provided for in this regulation or elsewhere. By according the Secretary the final appellate role in resolving individual administrative complaints, § 300.661(d) recognizes the Secretary's responsibility for coordinating policy matters implicated in EDGAR proceedings. Necessarily, the policy discretion thus reposed in the Secretary would be significantly undermined were decisions so fundamental as state-wide EDGAR enforcement left to the uncertainties of private enforcement.

Also instructive is the placement of the EDGAR regulations. These regulations, which are a part of the larger body of IDEA regulations, are codified apart from the regulations that implement the due process procedures culminating in a right of action expressly provided for in the IDEA itself. See 34 C.F.R. §§ 300.500–.515 (1993); 20 U.S.C. § 1415. The due process regulations are located under Subpart E, entitled "Procedural Safeguards," a heading that emphasizes the private party-orientation of procedures explicitly designed to guard substantive education rights. The EDGAR regulations, by contrast, are set forth under Subpart F, headed "State Administration," reflecting a more internally bureaucratic and administrative focus. This separation of the EDGAR regulations from the due process regulations underscores the materially less formal and more administrative nature of the EDGAR proceedings as contrasted with the due process procedures mandated by statute. Cf. Association for Community Living in Colo. v. Romer, 992 F.2d at 1045 (EDGAR procedures are different in purpose and scope from due process procedures). Necessarily, it also highlights the commensurately wider discretion to be afforded an agency in applying the EDGAR scheme as compared with the due process counterpart.

Comparison with the due process procedures also reveals that the 60–day time limit for resolving EDGAR complaints lacks the urgency of the 30– and 45–day time limits mandated by the due process regulations for decisions in due process hearings. See 34 C.F.R. § 300.512 (1993) (45–day time limit for decision in due process hearing conducted by local- or intermediate-level educational

agency; 30–day time limit for decision in hearing conducted by State Educational Agency). Specifically, the EDGAR regulations, unlike the due process regulations, contain no "stay-put" provision requiring the child to remain in his or her current educational placement during the pendency of proceedings. Compare 34 C.F.R. § 300.513 ("stay-put" provision for due process proceedings). Relying heavily on the possibility that this "stay-put" provision might keep a child in an allegedly inappropriate placement indefinitely were a complaint to remain pending beyond the time allotted, at least one court has interpreted the time limits in the due process procedures to confer a private right to enforce them. See John A. v. Gill, 565 F.Supp. 372, 381 (N.D.Ill.1983) (finding private right of action to enforce 30–day time limit contained in due process regulations of IDEA). There is no corresponding "stay-put" requirement in EDGAR proceedings. Accordingly, the considerations that moved the John A. court do not apply here.

Finally, the evolution of the EDGAR regulations cannot be ignored in determining the propriety of a private right of action to enforce them. The requirement that there be such proceedings is found nowhere in the IDEA itself, and it never has been. Indeed, the regulations themselves did not contain the 60–day time limit plaintiffs seek to enforce until the "EDGAR" codification phase, see Section IV.B., supra, and specifically, not until the 1981 promulgation of those regulations. See supra at nn. 10–12; 34 C.F.R. § 76.781 (1981). The official comment to the original version of the regulation issued in 1972, moreover, plainly observes that the regulation (as initially promulgated) "merely requires that such procedures exist." 37 Fed.Reg. 14575 (1972).

Collectively, the foregoing indicia within the language and history of the regulations reveal an intent to preserve a measure of "prosecutorial discretion" or leeway in enforcing the terms of those regulations. The degree of SEA infraction of the EDGAR regulations and the policy priority of proposed compliance measures are legitimate and necessary considerations in enforcement decisions. The intended agency discretion in

EDGAR enforcement matters simply cannot abide private interference of the sort contemplated by plaintiffs here.

In sum, a private right of action to enforce the EDGAR complaint procedures would not further the legislative purpose of what I will call "flexible accountability" expressed in section 1412(6). Consequently, even if section 1412(6) confers a private right of action, and even if the EDGAR regulations at issue are within the scope of that section, the EDGAR complaint procedures do not confer upon plaintiffs a private right of action to enforce them. Insofar as plaintiffs' IDEA claim is based on a direct right of action under the EDGAR complaint procedure regulations, that claim cannot survive.

## VI. RIGHT OF ACTION UNDER SECTION 1983 TO ENFORCE EDGAR PROCEDURES

■ Finally, I address the contention that plaintiffs' IDEA-based claim can be advanced under the alternative banner of 42 U.S.C. § 1983. Where applicable, section 1983 provides a cause of action for violation of rights created by federal statutes and regulations. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *West Va. Univ. Hosps., Inc. v. Casey,* 885 F.2d 11, 18 (3d Cir.1989), *aff'd,* 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991).

■ Until recently, the framework under section 1983 was clear. In order to invoke the remedy provided by section 1983, it was necessary to demonstrate that the substantive statute or regulation being enforced was intended to confer a federal right. *See West Va. Univ. Hosps., Inc. v. Casey,* 885 F.2d at 18 n. 1. A federal right could be identified in the statute by establishing that: (1) the provision at issue was intended to benefit the plaintiff, (2) the provision at issue reflected a binding obligation on the defendant rather than a mere Congressional preference, and (3) the plaintiff's interest was not so vague and amorphous as to be unenforceable. *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989). Even if a federal right was identified in the statute, however, a plaintiff's cause of action under section 1983

would still fail if the statute or regulation that conferred the federal right manifested, either expressly or by implication, an intent to foreclose a private remedy such as that provided by section 1983. *E.g., West Virginia Univ. Hosps., Inc.,* 885 F.2d at 18 n. 1.

But after the Supreme Court's recent decision in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), I question whether section 1983 is any more lenient than the traditional *Cort*-based standard for direct implication applied above. I need not decide this question today, however. Even under a pre-*Suter* analysis, I believe that implicit in the legislative scheme of which the EDGAR procedures are a part is the intent to foreclose a private remedy, at least under the narrow circumstances presented by OSEP's current involvement here. Thus, regardless of the impact of *Suter,* plaintiffs' section 1983 claim may not be pursued given the present facts.

I articulate the foreclosure analysis first. Afterwards, because it may become relevant, I elaborate my concerns regarding the section 1983 landscape after *Suter.*

### A. Section 1983 "Foreclosure" Analysis

■ Mindful of the admonition that intent to preclude reliance on section 1983 for a federally secured right is not to be "lightly" inferred, *Wright v. Roanoke Redev. & Housing Auth.,* 479 U.S. 418, 423–24, 107 S.Ct. 766, 770–71, 93 L.Ed.2d 781 (1987), and aware that neither the EDGAR procedures nor section 1412(6) expressly forbid the use of section 1983 suits, I focus my inquiry on whether section 1412(6) and the EDGAR complaint procedures are part of a remedial scheme that is "sufficiently comprehensive" to demonstrate the intent to foreclose the private remedy of a section 1983 action. *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981). The precise inquiry I undertake, however, is substantially narrower than this formulation would suggest. Only since the decision in *Maine v. Thiboutot* has there been a clear basis for using section 1983 to enforce federal statute-based claims such as those plaintiffs

advance here. In his dissent in that case, Justice Powell warned that such use of section 1983 represented "a major new intrusion into state sovereignty under our federal system." *Maine v. Thiboutot*, 448 U.S. at 33, 100 S.Ct. at 2519. Thus, the precise question before me is "just how far such an intrusion should be carried." *Carelli v. Howser*, 923 F.2d 1208, 1213 (6th Cir.1991). I conclude that, under the circumstances of this case, use of the section 1983 private remedy to enforce the EDGAR complaint procedures at issue would extend the judicial oversight function beyond that intended under those procedures. *Cf. Carelli v. Howser*, 923 F.2d at 1215.[18]

The Secretary is charged by statute with supervising state-level entities' compliance with the terms of section 1412(6) and other statutory provisions of the IDEA. 20 U.S.C. § 1416. The EDGAR complaint regulations specifically provide for appeal by aggrieved parties to the Secretary. 34 C.F.R. § 300.661(d) (1993). Monitoring and complaint resolution functions under the IDEA, including oversight of the EDGAR procedures themselves, are committed to the Secretary through the General Education Provisions Act. *See* 20 U.S.C. § 1232c(a) (Secretary may require state to submit plan for monitoring compliance; such plan may include complaint resolution procedures); 20 U.S.C. § 1221e–3(a)(1) (Secretary authorized to promulgate regulations governing operation of programs under IDEA and other funding statutes). Section 1413 of the IDEA, which requires periodic compliance review of state plans, contains a further source of authority enabling the Secretary to monitor the EDGAR complaint procedures. 20 U.S.C. § 1413(c) (Secretary shall disapprove submitted plan or plan modification that does not meet statutory requirements). Using this authority, the Secretary has delegated to OSEP the responsibility of conducting state-level audits, investigating complaints of state-level entities, and initiating an escalating series of enforcement measures against recalcitrant SEAs that range from informal resolution procedures to administrative cease-and-desist hearings to full-blown litigation, either in the form of a funds-withholding proceeding or an injunction-seeking proceeding arising out of a Justice Department referral. *See* Wegner, *Future Rights and Remedies*, 17 J.L. & Educ. at 690; Will–Trible Letter, Handicapped Educ.L.Rep. (CRR) 211:397 (citations omitted).

■■■■ And these administrative mechanisms are not the only IDEA remedies relevant in the foreclosure analysis. In addition, the statute codifies an express private right of action in the due process provisions of the IDEA. 20 U.S.C. § 1415. This due process right of action, which is initiated by an IEP-related grievance, confers jurisdiction on a reviewing court to adjudicate grievances based on any provision of the IDEA—including grievances arising from the EDGAR complaint regulations—as long as such grievances are implicated in the context of an individual dispute over a child's IEP. *See Georgia Ass'n of Retarded Citizens v. McDaniel*, 716 F.2d 1565, 1573 (11th Cir. 1983) ("There is nothing in [section 1415] to suggest that the due process rights of a parent under the [IDEA] are to be curtailed merely because the challenge to the IEP happens to implicate a portion of a state's plan."). Moreover, the express right of action under the due process mechanism is accessible without prior exhaustion of the EDGAR complaint procedures, at least where the administrative procedures of the due process system itself have been exhausted. *See Mrs. W. v. Tirozzi*, 832 F.2d 748, 758 (2d Cir.1987). Where exhaustion of the EDGAR complaint procedures would be required for a due process review, it can be excused where, as plaintiffs allege here, there is persistent undue delay on the part of state officials in resolving the predicate EDGAR complaints. *See Hoeft v. Tucson Unified School Dist.*, 967 F.2d 1298, 1308 & n. 9 (9th Cir.1992) (refusing to excuse exhaustion based on state's failure to respond to 60–day time limit in EDGAR regulations where state

---

**18.** I emphasize the limited scope of my holding. I do not address whether a section 1983 remedy would ever be permitted under section 1412(6) or regulations promulgated pursuant to that section. I simply hold that such a remedy was not intended to enforce the EDGAR complaint procedures under the circumstances presented here.

had requested extension and had indicated that report would be forthcoming, but noting that persistent failure to respond in timely manner would excuse exhaustion requirement in due process setting).

This remedial scheme might not be "sufficiently comprehensive" to imply preclusion of private enforcement for every right conferred by section 1412(6). Nonetheless, any determination of its sufficiency as to preclusive intent here cannot be divorced from the "essentially cooperative federal-state relationship" created by the IDEA and reflected, in part, in the EDGAR complaint procedures that provide the right to be remedied here. As discussed above with respect to the direct implication of a private remedy, SEA accountability is not the only feature of the EDGAR complaint procedures; SEA autonomy and operational flexibility are characteristic of those procedures as well. *See* Wegner, *Future Rights and Remedies*, 17 J.L. & Educ. at 694. Given this mixed nature of the right plaintiffs seek to enforce, I find that the foregoing administrative mechanism is comprehensive enough to manifest intent to preclude a private remedy to enforce the EDGAR complaint procedures under the circumstances presented here. A contrary result would do violence to the balance of "flexible accountability" embodied in those procedures.

Integral to my holding that a private action should be foreclosed here is the Sixth Circuit's reasoning in *Carelli v. Howser*, 923 F.2d 1208, 1215 (6th Cir.1991). There, the court concluded that Congress intended to foreclose a section 1983 remedy to redress violations of certain child support enforce-ment provisions under Title IV–D of the Social Security Act, codified at 42 U.S.C. §§ 651–669. In reaching that conclusion, the court found significant that plaintiffs had not alleged any acts of noncompliance with the relevant state plan other than those the Secretary of Health and Human Services had already unearthed in an audit and ordered corrected. *Carelli*, 923 F.2d at 1215. The court characterized plaintiffs' suit as little more than a request for a "hurry up" order, which the court described with the following trenchant remarks:

> What we envision happening would be an order coming from the court directing the State of Ohio to increase staff size, do a better job of establishing priorities, and setting time limits for performing required tasks as well as responding to calls for service. In short, the court's order would address all the shortcomings the Secretary [of Health and Human Services] has already ordered corrected.

*Id.* (footnote omitted).

As in *Carelli*, the relief plaintiffs seek here, reduced to its essence, is a "hurry up" order to expedite remediation of deficiencies that OSEP has already identified and ordered corrected. *See* Report of Special Master, App. C. Thus, my ruling is "akin to an abstention order, although [I] do not label it as such." *Carelli*, 923 F.2d at 1216. *But see Albiston v. Maine Comm'r of Human Servs.*, 7 F.3d 258, 268–69 (1st Cir.1993) (declining to follow *Carelli*'s conclusion that it is "unlikely that Congress intended [private parties] to occupy the same ground at the same time and in the same manner as the Secretary" of Health and Human Services).[19]

---

19. I am aware that I do not write on a clean slate in this area. One decision, *Mrs. W. v. Tirozzi*, 706 F.Supp. 164 (D.Conn.1989), has squarely addressed the issue and found that a cause of action does exist under section 1983 to enforce the EDGAR complaint procedures. *Id.* at 168–69. For the following reasons, however, I decline to follow the holding in *Mrs. W.*. First and most important, that case did not involve a group of plaintiffs seeking to expedite the correction of the very deficiencies already identified and ordered corrected by federal regulators. *Cf. Carelli v. Howser*, 923 F.2d at 1215–16. The case before me involves precisely such overlap. *See* Report of Special Master, App. C, at 49. Second, the *Mrs. W.* court did not undertake a foreclosure analysis; it addressed only the preceding question of whether section 1412(6) creates an enforceable federal right. *See Mrs. W.*, 706 F.Supp. at 167 ("[Defendants] contend that § 1412(6) creates no right to [the complaint resolution procedures] which can be enforced by way of a § 1983 action."). Third, I respectfully submit that *Mrs. W.* placed full emphasis on the accountability dimension of section 1412(6), according insufficient consideration to the values of federalism and SEA flexibility that are inherent in the legislation. Finally, because *Mrs. W.* was decided before *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), its validity can no longer be considered beyond question. *See infra.*

The amendment of the IDEA to add section 1415(f), which permitted section 1983 suits under the statute in appropriate circumstances, does not alter my conclusion. As noted above, the legislative history of section 1415(f) itself plainly reveals that the amendment was not intended to affect the EDGAR complaint procedures. *See* H.R.Rep. No. 296, 99th Cong., 1st Sess., at 7–8 (1985). Thus, the addition of section 1415(f) cannot be viewed as opening the door to section 1983 suits to enforce the EDGAR complaint procedures.[20]

\* \* \* \* \* \*

I am not without empathy for plaintiffs' plight. I wish to see DOC function properly and provide effective redress for plaintiffs' grievances. My ruling, therefore, is predicated on my hope that a satisfactory result can be achieved without judicial compulsion in light of OSEP's ongoing attempts to resolve the problems at issue here. I intend to allow these efforts to run their course, which, as I understand it, will happen soon enough, sometime in early 1995. *See* Report of Special Master, at 9. But if plaintiffs are still not satisfied with the functioning of DOC's complaint procedures by the time OSEP's involvement here is terminated or after June 30, 1995, whichever is earlier, I will allow them to re-assert their section 1983 claim then.

### B. *Section 1983 Claims After Suter v. Artist M.*

■ I rest my decision on the foreclosure analysis as applied in the circumstances presented here. Because plaintiffs may re-assert their section 1983 claim later, however, I feel compelled to warn them that, as I read it, the Supreme Court's decision in *Suter v. Artist M.* has substantially changed the landscape of section 1983 law. Specifically, I believe that after *Suter* the standard for

advancing a private remedy under section 1983 is no more lenient than the traditional *Cort*-based standard for direct implication applied earlier in this opinion.

*Suter*, like this case, involved a federal assistance program designed to encourage certain behavior on the part of states, the Adoption Assistance and Child Welfare Act of 1980. That program attempted to induce states to raise the quality of care for children in state foster-care programs. At issue in *Suter* was a provision that required participating states to submit a plan to the Secretary of Health and Human Services that provided for the state to make "reasonable efforts" to prevent removal of a child from the home before utilizing the foster-care option.

In a groundbreaking 7–2 decision by Chief Justice Rehnquist, the Court held that the "reasonable efforts" clause was not enforceable by private parties under section 1983. The majority formulated the critical inquiry thus: "Did Congress, in enacting the Adoption Act, *unambiguously confer upon [the plaintiffs] a right to enforce* the requirement that the State make 'reasonable efforts' to prevent a child from being removed" from the home? *Suter*, 503 U.S. at 357, 112 S.Ct. at 1367 (emphasis added). Answering in the negative, the majority concluded, in a holding difficult to reconcile with its earlier holding in *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), that the only clear mandate of the "reasonable efforts" clause was that participating states adopt a plan with the requisite features, not that they be accountable to private parties for failure to execute that plan. *Suter*, 503 U.S. at 364–372, 112 S.Ct. at 1371–74 (Blackmun J., dissenting). In addition to a close reading of the text and history of the provision at issue, the majority found signifi-

---

**20.** Plaintiffs contend that the Second Circuit's opinion in the *Mrs. W.* case holds that section 1983 can indeed be used to enforce the EDGAR complaint procedures after the enactment of section 1415(f). *See Mrs. W. v. Tirozzi*, 832 F.2d 748, 754–55 (2d Cir.1987). I disagree. A careful reading of that decision discloses that the Second Circuit held only that section 1983 suits were indeed applicable under the IDEA after the addition of section 1415(f) to that statute, a point

that was not made express in the amendment itself but is clear from the legislative history. *Mrs. W.*, 832 F.2d at 754–55. The Second Circuit expressly declined to consider the merits of the particular EDGAR-based claims at issue there. *Id.* at 759. I do not dispute that section 1983 can be used to enforce rights under the IDEA. I hold only that, for the reasons set forth above, it cannot be used in the narrow circumstances presented here.

cant that other sections of the statute expressly provided an alternative, administrative mechanism to enforce the "reasonable efforts" clause such that the latter could not be considered a "dead letter." *Suter*, 503 U.S. at 360–61, 112 S.Ct. at 1368–69.

As the dissent observed, the court silently overruled years of jurisprudence under section 1983, shifting the burden onto the plaintiff to prove that the statutory provision at issue confers a private remedy as well as a private right. *Suter*, 503 U.S. at 376, 112 S.Ct. at 1377 (Blackmun J., dissenting) (majority has "inverted the established presumption that a private remedy under § 1983 unless 'Congress has affirmatively withdrawn the remedy.'"). Effectively, *Suter* collapses the section 1983 standard into the traditional standard under *Cort v. Ash* for direct implication of a private right of action. *See* Lisa L. Frye, Note, *Suter v. Artist M. and Statutory Remedies Under Section 1983: Alteration Without Justification*, 71 N.C.L.Rev. 1171, 1201 (1993) ("[A]fter *Artist M.*, plaintiffs bringing suit under § 1983 shoulder virtually the same burden … as private plaintiffs who attempt to persuade the Court to find an implied cause of action.").

It would appear that *Suter*, then, has produced something of a tectonic movement in section 1983 litigation. Indeed, even those circuits that have shrunk from such a conclusion have not failed to recognize that *Suter* has "weaken[ed] earlier precedents in certain important respects" and "reconfigured" the previous framework. *Stowell v. Ives*, 976 F.2d 65, 68 (1st Cir.1992). *See also Resident Council of Allen Parkway Village v. United States Dep't of Hous. & Urban. Dev.*, 980 F.2d 1043, 1051 (5th Cir.) (*Suter* "calls into question the continued viability of the [previous] framework"), *cert. denied*, —— U.S. ——, 114 S.Ct. 75, 126 L.Ed.2d 43 (1993); *Arkansas Medical Society Inc. v. Reynolds*, 6 F.3d 519, 525 (8th Cir.1993) (*Suter* placed "great emphasis on the fact that rights must be 'unambiguously' conferred to be enforceable.").[21] And while the Third Circuit has not directly addressed this admittedly controversial issue, it too appears inclined to-

ward an appreciation of *Suter*'s broader ramifications. *See United States v. Accounts Nos. 3034504504 & 144–07143*, 971 F.2d 974, 982 (3d Cir.1992) (observing, based on *Suter*, that Supreme Court now seems "especially reluctant to imply provisions that are ordinarily expressly stated into statutes that do not mention them."), *cert. denied sub nom. Friko Corp. v. United States*, —— U.S. ——, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993). *See also Baby Neal v. Casey*, 821 F.Supp. 320, 326, 328 (E.D.Pa.1993) (emphasizing *Suter*'s formulation of test as whether statute "unambiguously confers" private right of action on plaintiff, and finding no cause of action under provisions of Adoption Act not addressed in *Suter*), *remanded by*, 43 F.3d 48 (3d Cir.1994) (reversing district court's earlier order denying class certification, but declining to address issue of private right of action).

All this has possibly dispositive implications for plaintiffs' section 1983 claim if they should re-assert it. Plaintiffs, seizing upon *Suter*'s consideration of the mandatory nature of the statutory language at issue and the specificity of the relevant regulations, argue that section 1412(6) and the EDGAR complaint regulations should be interpreted to allow a section 1983 action here even under a post-*Suter* analysis. Pls.' Br. in Resp. to Order of Oct. 25, 1994, at 8–9. But as discussed at length above, I conclude that, under the *Corestates/Angelastro* framework for direct implication of a right of action to enforce a regulation, a private right to enforce the EDGAR complaint procedures would not further the legislative purpose of "flexible accountability." Thus, I am not inclined to read the regulatory provisions at issue here as "unambiguously conferring" the private right of action plaintiffs claim. Accordingly, while I expressly refrain from so ruling, I observe that, even if plaintiffs' section 1983 claim had merit before *Suter*, I have strong reservations about whether it still does. *Suter*, 503 U.S. at ——, 112 S.Ct. at 1367.

---

21. *See generally Wood v. Tompkins*, 33 F.3d 600, 606 (6th Cir.1994) (collecting cases that synthe-size *Suter* with prior precedent represented by *Wilder*).

## VII. CONCLUSION

For the foregoing reasons, I conclude that plaintiffs are without a private right of action to enforce the EDGAR complaint procedures directly under those regulations themselves. I also conclude that, under the current circumstances of this case, plaintiffs may not use section 1983 to enforce the EDGAR complaint procedures, although plaintiffs are free to raise the section 1983 claim again after the termination of OSEP's current efforts to rectify DOC's deficiencies or after June 30, 1995, whichever is earlier. Accordingly: (i) plaintiffs' motion for summary judgment on the direct IDEA claim is denied, and summary judgment on that claim is entered in favor of PDE; (ii) summary judgment on plaintiffs' section 1983 claim is entered in favor of PDE, and that claim is dismissed without prejudice to re-assert it in accordance with the terms of this opinion; and (iii) plaintiffs' motion to certify these claims for class treatment is denied as moot. Finally, while I do not address either the merits of plaintiffs' Rehabilitation Act claim or the appropriateness of that claim for class treatment, I defer any ruling on plaintiffs' motion for class certification with respect to that claim until such time as the argument on that claim is further developed and I can determine whether summary judgment would be suitable.